**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Lee B. SMITH and Robert H. Carr,
Defendants-Appellants.**

**No. 81–1094.**

United States Court of Appeals,
Sixth Circuit.

Argued April 15, 1982.

Decided Aug. 26, 1982.

Rehearing and Rehearing En Banc Denied
Oct. 11, 1982.,

Certiorari Denied Jan. 10, 1983.
See 103 S.Ct. 752.

Warren D. Bracy, Jr., Detroit, Mich., for defendants-appellants.

Richard A. Rossman, U. S. Atty., James Genco, Asst. U. S. Atty., for plaintiff-appellee.

Before PHILLIPS and BROWN *, Senior Circuit Judges, and TUTTLE,** Senior Circuit Judge.

BAILEY BROWN, Senior Circuit Judge.

Lee B. Smith and Robert H. Carr were convicted on January 29, 1981, following a jury trial in the United States District Court, for the Eastern District of Michigan, of conspiracy to transport stolen goods in interstate commerce in violation of 18

---

* Circuit Judge Bailey Brown retired from regular active service under the provisions of 28 U.S.C. § 371(b) on June 16, 1982, and became a Senior Circuit Judge.

** The Honorable Elbert P. Tuttle, Senior Circuit Judge for the Eleventh Circuit Court of Appeals, sitting by designation.

U.S.C. § 371 (1976) and interstate transportation of stolen goods in violation of 18 U.S.C. § 2314 (1976). Although the defendants challenge on appeal the sufficiency of the evidence against them, the evidence was overwhelming that both men participated in the interstate transportation and sale of 512 General Motors transmissions that had been stolen from the U. S. Truck Terminal in Ypsilanti, Michigan on August 25, 1979. The transmissions were delivered by the defendants and sold as salvage for $68,580.00 to Bishop Automotive (Bishop) in Dallas, Texas on September 4, 1979. As payment, Smith and Carr requested and received from Bishop four equal checks of $17,145.00, with three checks made out to Lee Smith and one check made out to Robert H. Carr. Through the intercession of Bishop officials, these four checks were endorsed and cashed the same day of the delivery by the Mercantile National Bank in Dallas. The major focus of the present appeal centers on the identification at trial of the signatures on the endorsements.

An investigation of the stolen transmissions was commenced by F.B.I. Agent Thomas Love in October of 1979, and Smith and Carr were linked to the endorsed checks. Love requested Assistant United States Attorney Mark Werder to obtain grand jury subpoenas for Smith and Carr to appear before the grand jury for the United States District Court for the Eastern District of Michigan to provide handwriting exemplars. Werder opened a grand jury file on the case by assigning the matter a grand jury number, scheduled some time for the defendants' grand jury appearance on December 4, 1979, and obtained grand jury subpoenas for service on the defendants.

When Smith and Carr appeared pursuant to the subpoenas on December 4, they were met by Love and Werder in the waiting room located between the grand jury room and the United States Attorney's Office. The defendants were advised by Werder that they would not have to appear before the grand jury then in session if they would voluntarily consent to give handwriting exemplars. Werder testified that it was his practice to advise individuals that they had a right to appear before the grand jury if they desired, and he also usually inquired whether they had consulted with an attorney about the grand jury subpoena they had received, although he did not recall if he specifically did so in this instance. Smith and Carr agreed to forego their grand jury appearance by providing their handwriting exemplars. Werder testified that his normal procedure when this occurred was to "pop in" the grand jury room and advise the grand jury that the grand jury appearance on their schedule was cancelled because the subpoenaed individuals had agreed to voluntarily produce the desired information.

Smith and Carr were indicted on September 18, 1980. The defendants moved to have the handwriting exemplars suppressed because they contended that the procedure used to procure those exemplars was an abuse of the grand jury process. District Judge Churchill denied this motion in a ruling issued from the bench after an evidentiary hearing and an extended argument of the motion. Defendants' attorney also requested the minutes of the grand jury proceedings, and moved to dismiss the indictment. Both motions were denied. At the close of the government's case, defense counsel moved for judgments of acquittal on both counts for both defendants. These motions were also denied.

■ Preliminarily, we are in agreement with the government's contention that Carr has no grounds to complain on appeal of the district court's failure to suppress his handwriting exemplar, since the handwriting expert at trial was unable to link Carr to the Bishop checks after comparing Carr's handwriting exemplar and the endorsement signature on the check allegedly given to Carr. Smith contends that his handwriting exemplar was not voluntarily given because he was under the mistaken impression that it was the grand jury who had authorized the subpoena commanding his appearance. Smith argues that since it was the Assistant United States Attorney who authorized and

obtained the grand jury subpoena, in substance the United States Attorney's Office was the party directing that the handwriting exemplar be given, not the grand jury. He claims that the grand jury did not initiate this investigation and was not aware of the investigation other than a terse entry on its schedule for defendants' appearance. In essence, Smith asserts that the aura of authority created by Werder's obtaining of the grand jury subpoena lured him into cooperating with Werder, whereas had he known that the grand jury had not initiated the issuance of the subpoena and indeed was not even aware of this investigation, he would not have cooperated with Werder. Smith claims that before the government can use a grand jury subpoena to acquire cooperation from an individual, the grand jury must have actually authorized the subpoena.

The United States contends that the procedure used to direct Smith to appear before the grand jury was not an abuse of the grand jury system and that Smith freely and voluntarily consented to give the government his handwriting exemplar after being informed of his right to appear before the grand jury. The government notes that the subpoena directed only that the defendants appear before the grand jury for the purpose of providing the exemplars, but the grand jury direction to actually provide the exemplars would not have occurred until their actual grand jury appearance.[1]

Judge Churchill, ruling from the bench, determined that insofar as the defendants consented to give their exemplars "under the threat or weight or pressure . . . of a grand jury subpoena," there had not been "in one sense of the word a totally voluntary giving of exemplars." App. 90. The district judge also noted a potential for abuse in the grand jury's role as an investigatory arm of the government, since the grand jury is essentially under the supervision and control of the United States Attorney who initiates and directs grand jury

investigations. Nevertheless, Judge Churchill denied defendants' motion to suppress, concluding that "for evidence of this kind to be admissible, there must be a good faith intention to call the individual before the grand jury. I find in this case that good faith intention in fact existed." App. 94–95. The district judge also denied defendants' motions to dismiss the indictment and to disclose the grand jury minutes.

We concur with the district court's assessment that, although a potential for abuse exists in the interrelated responsibilities of the United States Attorney and the grand jury, an abuse did not occur in this instance and therefore suppression of the handwriting exemplars was not warranted.

We recognize that grand juries "are for all practical purposes an investigative and prosecutorial arm of the executive branch of government." *In re Grand Jury Proceedings (Schofield)*, 486 F.2d 85, 90 (3d Cir. 1973). While "the powers of the United States Attorney in connection with a grand jury investigation are substantial," the federal courts have an obligation to supervise that relationship "if the grand jury's own role [in the investigatory process] is to remain at all meaningful." *In re Melvin*, 546 F.2d 1, 5 (1st Cir. 1976). However, since the directive to Smith to appear before the grand jury may properly be construed as originating from the authority of the grand jury, the United States Attorney did not improperly usurp the authority of the grand jury.

According to the First Circuit, the authority of the United States Attorney in connection with grand jury investigations extends to "select[ing] the witnesses to be subpoenaed to appear before the grand jury and generally direct[ing] the investigation." *Id.* (citation deleted). "The United States Attorney may obtain subpoenas issued in blank by the court, fill in the blanks, and have the witnesses served without consulting the grand jury." *Id.* (citations deleted). *See also*, Fed.R.Crim.P. 17(a). However, the

---

1. The returned subpoenas were misplaced by the government and were not available at trial. District Judge Churchill found that the subpoenas were issued and served in good faith by the government on the defendants. App. 90. Smith does not dispute this finding.

United States Attorney exceeds his authority when he goes "beyond the routine issuance of subpoenas and other actions in which the United States Attorney has proceeded without specific direction of the grand jury." *Melvin, supra,* 546 F.2d at 5. The First Circuit has made it clear that a United States Attorney "may not use his subpoena powers under [Federal] Rule [of Criminal Procedure] 17 to gather evidence without the participation of the grand jury," and that "a grand jury alone enjoys the inherent right to *compel* production of identification evidence." *Id.* at 4–5 (emphasis added). The First Circuit concluded that in the case before it, "the United States Attorney short-circuited the usual procedure; rather than subpoenaing Melvin, having the grand jury request his appearance in a lineup, and only on his refusal to comply seeking a court order, the United States Attorney, without showing a prior grand jury directive addressed to Melvin, went directly to court seeking the order compelling Melvin to appear in a lineup." *Id.* at 4. The First Circuit determined that "[t]his was no mere technical error . . . but an error affecting the proper roles of the prosecutor and the grand jury. . . ." *Id.* "[T]he *directive* [for the production of identification evidence] has to come from the grand jury itself and has to be conveyed by the grand jury to the witness in an appropriately formal fashion." *Id.* at 5 (emphasis added). Professor Moore, citing *In re Melvin,* concluded: "The grand jury occupies the primary and nearly exclusive role as the agency of *compulsory disclosure.*" 8 MOORE'S FEDERAL PRACTICE ¶ 17.06 n.11 (2d ed. Supp. 1982) (emphasis added).

Other authorities have emphasized the practicalities of the relationship between the United States Attorney and the grand jury. For example, the Third Circuit has stated: "[A]lthough grand jury subpoenas are occasionally discussed as if they were the instrumentalities of the grand jury, they are in fact almost universally instrumentalities of the United States Attorney's office or of some other investigative or prosecutorial department of the executive branch." *In re Grand Jury Proceedings*

*(Schofield), supra,* 486 F.2d at 90. This practical result flows from the manner in which the subpoenas are issued: "[L]ike all federal court subpoenas grand jury subpoenas are issued in the name of the district court over the signature of the clerk[;] they are issued pro forma and in blank to anyone requesting them." *Id.* Professor Moore has concluded that "[t]he prosecutor [United States Attorney] is in control of grand jury proceedings." 8 MOORE'S FEDERAL PRACTICE ¶ 6.04[1] (2d ed. 1965). *See also, id.* at ¶ 17.06. In addition, he has stated: "[T]he grand jury is hardly capable of taking the initiative in the often complex matters arising in federal criminal litigation. It must necessarily rely on the Executive Branch—specifically, the Justice Department under the direction of the Attorney General—to initiate and prepare the criminal cases which come before it." *Id.* at ¶ 6.02[I]

It has been the opinion of some federal courts that a United States Attorney assumes the authority of the grand jury by obtaining handwriting exemplars in the manner in which it was done here. In *United States v. O'Kane,* 439 F.Supp. 211 (S.D.Fla.1977), the district court suppressed handwriting exemplars when it determined that they were not given voluntarily because subpoenaed grand jury witnesses were informed by an Assistant United States Attorney prior to their grand jury appearance that they could either provide the exemplars voluntarily or they would be forced to provide them under the court's contempt powers. In *United States v. Santucci,* 504 F.Supp. 1072 (N.D.Ill.1980), *aff'd on rehearing,* 509 F.Supp. 177 (N.D.Ill.1981), *rev'd,* 674 F.2d 624 (7th Cir. 1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 737 (1982), the district court determined on facts very similar to the instant case that only the grand jury could request the furnishing of handwriting exemplars. The court held that when the United States Attorney gives individuals their choice of volunteering their exemplars or appearing before the grand jury, that bypass of grand jury participation is a vio-

lation of the Fourth and Fifth Amendments.

The Seventh Circuit, in a split decision, reversed the district court in *Santucci*. In *Santucci*, two postal inspectors investigating the theft of United States Treasury checks identified three men as suspects. The postal inspectors enlisted the aid of the Assistant United States Attorney, who completed and issued blank grand jury subpoenas *duces tecum* for handwriting exemplars, fingerprints, and photographs. The government conceded "that neither were the subpoenas sought or obtained from any grand jury, nor had the case been opened before a grand jury." *Santucci, supra,* 674 F.2d at 625. When the subpoenas were served by the postal inspectors, they gave the subpoenaed individuals the oral option of meeting them at the post office to supply the desired items of identification if the suspects preferred to not appear before the grand jury. When the subpoenaed individuals met with the inspectors, they were advised of their constitutional rights and also informed of their right to appear before the grand jury if they wished. The individuals provided all the items sought by the inspectors.

The issue addressed by the Court of Appeals was: "[C]an the United States Attorney be permitted to use evidence gathered by the use of a grand jury subpoena not actually authorized by a grand jury that also gives the witness an option to satisfy that subpoena outside the presence of the grand jury?" *Id.* at 627. The Seventh Circuit noted that although it was permissible for the United States Attorney to fill out grand jury subpoenas issued in blank without actual prior grand jury authorization, and likewise permissible for a grand jury to provide an option in its subpoena for the witness to provide identification evidence outside the actual presence of the grand jury, the combination of those two factors was considered by the *Santucci* district court "to be constitutionally impermissible because of the absence of sufficient involvement by the grand jury." *Id.*

The Seventh Circuit disagreed, failing to see the purpose to be served by excluding the evidence:

[E]xclusion serves little purpose in preventing abuse or even in repairing it because it is beyond argument that the government would have been entitled to secure the identification items by the strict issuance and use of a grand jury subpoena *duces tecum*, or by other pretrial procedures. To exclude those identification items would only delay the inevitable for the benefit of no one, but to the unnecessary detriment of expeditious law enforcement efforts.

*Id.* at 632. The Seventh Circuit further noted:

Had the defendants chosen to respond to the subpoenas by appearing at the grand jury, instead of at the inspectors' office, there apparently would have been no basis to exclude as viewed by the trial judge.... But the defendants for their own purposes, preferring to avoid the grand jury itself, opted to go to the post office at a time of their choice. Their decision to take advantage of that convenient option should not justify exclusion on the basis that the grand jury, therefore, was not sufficiently involved. The defendants are themselves in part responsible for the absence of grand jury involvement at that point. We see no constitutional violation; we see no egregious conduct by the government; and we see absolutely no reason or purpose to be served by exclusion of the identification items in the circumstances of this case.

*Id.*

The evil to be avoided in the interrelationship between the grand jury and the United States Attorney is the prosecutor's usurpation of the grand jury's authority to *direct* subpoenaed individuals to provide information or evidence. However, as a practical matter, it will be a rare event when a grand jury itself initiates an investigation or obtains subpoenas of its own volition. Smith apparently contends that the grand jury's imprimatur does not attach to a grand jury subpoena issued at the request of the United States Attorney without the

grand jury's prior knowledge until the subpoenaed individual appears before the grand jury, at which time the request for the subpoena is ratified by the grand jury. At that point, the grand jury would then direct of its own volition the production of the handwriting exemplar. We cannot agree with this conclusion.

We conclude that the Assistant United States Attorney did not overreach his authority by requesting the issuance of the grand jury subpoena to be served on Smith, nor was it an abuse of the process for him to suggest a voluntary production of the handwriting exemplar as a permissible alternative to appearing before the grand jury.[2] The authority and involvement of the grand jury was implicit in this transaction, even though only peripherally, when Smith's appearance was placed on the grand jury's schedule, a grand jury file was opened for the investigation, and the grand jury was probably informed why Smith did not make his scheduled appearance. There is no suggestion that Werder *ordered* Smith to produce the exemplars, nor any indication that his suggestion was viewed by Smith as a *mandatory* direction. Werder did not invoke the grand jury's authority for the "requisition of the material through the use of the subpoena power," Holderman, *Preindictment Prosecutorial Conduct in the Federal System*, 71 J.CRIM.L. & CRIMINOLOGY 1, 8 (1980); he merely suggested a convenient alternative to Smith's impending grand jury appearance. Likewise, there is no contention that the subpoena was not

legitimate, nor does Smith claim any legitimate basis for resisting production of his handwriting exemplar had he chosen to appear before the grand jury. Although the district judge thought it speculative whether or not the grand jury would have ordered Smith to provide his exemplar, we consider it is more likely than not that the grand jury would have directed its production in light of the evidence warranting a strong suspicion of Smith's involvement in the sale of the stolen transmissions. Furthermore, Smith was "in part responsible for the absence of grand jury involvement," *Santucci, supra,* 674 F.2d at 632, because his cooperation with the Assistant United States Attorney precluded the grand jury from giving its stamp of approval in this case. Finally, the district judge found that Werder intended in good faith to bring Smith before the grand jury if Smith chose not to cooperate and therefore Werder did not intend to trick Smith into providing evidence the government could not otherwise obtain. These findings are not clearly erroneous. *See United States v. Jabara,* 644 F.2d 574, 577 (6th Cir. 1981) (facts found by a district judge at a suppression hearing examined under clearly erroneous standard). *Compare Santucci, supra* at 632 ("Although the government's good faith is not determinative," the Seventh Circuit concluded it was an important factor for consideration).

It necessarily follows that the district court did not err in overruling defendants' motions to dismiss the indictment and to produce the grand jury minutes. In or-

---

2. We note that the circumstances in which other federal courts have found that the United States Attorney abused his powers by usurping the grand jury's authority are not present in the instant case. Smith's subpoena did not order him to appear in the United States Attorney's office for interrogation. *See Durbin v. United States,* 221 F.2d 520, 522 (D.C.Cir.1954) (grand jury subpoena may not be used "as a compulsory administrative process of the United States Attorney's office ... for the purpose of conducting his own inquisition") and *United States v. DiGilio,* 538 F.2d 972, 985 (3d Cir. 1976), *cert. denied,* 429 U.S. 1038, 97 S.Ct. 733, 50 L.Ed.2d 749 (1977). Nor did the subpoena compel Smith's attendance at an unauthorized proceeding. *See United States v. Keen,* 509 F.2d 1273 (6th Cir. 1975) (per curiam). Werder

did not threaten to use the court's contempt power to force Smith's cooperation, *see United States v. O'Kane, supra,* nor were the circumstances surrounding Werder's suggestion of voluntarily producing the handwriting exemplars in lieu of Smith's scheduled grand jury appearance inherently coercive. *Compare United States v. Duncan,* 570 F.2d 292 (9th Cir. 1978) (per curiam). Unlike *Santucci,* in the instant case there was some grand jury involvement in the investigation, although admittedly the grand jury was only peripherally involved. Nor was this a case in which the grand jury was not in session when the subpoena was returnable. *Compare United States v. Kleen Laundry & Cleaners, Inc.,* 381 F.Supp. 519 (E.D.N.Y.1974).

der for this court to order a dismissal of an indictment as part of its supervisory powers, there must be a "showing of demonstrated and longstanding prosecutorial misconduct" as well as a showing of "prejudice to the defendant." *United States v. Nembhard*, 676 F.2d 193, 199–200 (6th Cir. 1982). Neither is present here. Nor has Smith shown a "particularized need" for disclosure of the grand jury transcripts, especially in light of his decision not to appear before the grand jury. *United States v. Short*, 671 F.2d 178 (6th Cir.), *cert. denied*, — U.S. ——, 102 S.Ct. 2932, 73 L.Ed.2d 1332 (1982).

We have considered the appellants' other contentions of error and determine that they are without merit.

In conclusion, the district court did not err in refusing to suppress the handwriting exemplars procured from Smith and Carr. There was no constitutional violation or otherwise egregious conduct in the suggestion of the Assistant United States Attorney that Smith and Carr voluntarily provide their exemplars if they preferred to not appear before the grand jury. Furthermore, there was more than sufficient evidence presented at trial to convict both defendants, and the other contentions of Smith and Carr are utterly without merit.

AFFIRMED.