**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Donald Mark NATHAN,
Defendant-Appellant.**

No. 86–5246.

United States Court of Appeals,
Sixth Circuit.

Argued Nov. 21, 1986.

Decided April 9, 1987.

Rehearing and Rehearing En Banc
Denied June 1, 1987.

Herbert S. Moncier (argued), Ann C. Short (Court-appointed), Knoxville, Tenn., for defendant-appellant.

John W. Gill, U.S. Atty., Nancy Palmer (argued), Knoxville, Tenn., for plaintiff-appellee.

Before MERRITT, WELLFORD and NORRIS, Circuit Judges.

WELLFORD, Circuit Judge.

Defendant, Donald Mark Nathan, appeals his conviction for interstate transportation of three securities taken by fraud in violation of 18 U.S.C. § 2314. For the reasons that follow, we AFFIRM the conviction of defendant.

## I. FACTUAL BACKGROUND

Nathan, who was a stockbroker with Prudential-Bache ("Pru Bache") in Knoxville, Tennessee, was indicted by the government for interstate transportation in 1984 of three checks allegedly "taken by fraud," which were drawn on the account of Pru Bache and payable to Robert L. Shirley. The theory of the prosecution was that Nathan, while with Pru Bache, removed $75,000 from Shirley's account and deposited the money in his own account for his personal use.

Charles West, a C.P.A., who managed the personal finances of Robert Shirley, used the defendant as a broker for Shirley's stock account. The account was a command account that could be drawn upon by request or by writing a check upon the account. Along with Shirley, West had access to the funds in the account.

West received two unrequested $25,000 checks drawn upon Pru Bache's bank account and payable to Shirley in February of 1984. When West questioned the defendant, he was told that the checks had been issued erroneously by Pru Bache when another broker had listed the wrong account number on a check request form. West returned the checks to the defendant for redeposit to correct the error.

West again questioned the defendant when he received the February statement for Shirley's account, showing two $25,000 debit entries and no corresponding credit entry showing the return of the funds. The defendant responded that the $50,000

had been used to purchase certificates of deposit for Shirley from a bank in Gatlinburg and that the certificates would be kept at Pru Bache for safekeeping. West later learned that no certificates had ever been purchased.

West did not recall ever receiving a third $25,000 Pru Bache check, but in mid-March, he had asked Nathan to transfer $25,000 from Shirley's account to Shirley's wife's account. When the transfer was not reflected on the March account statement, the defendant told West that it was a bookkeeping error. West later learned that no such transfer of funds was ever made by the defendant.

In May, 1984, the defendant left Pru Bache to work for another brokerage firm, Cralin and Company in Florida. At Nathan's request, the Shirley accounts were transferred with him. After the defendant went to Cralin, he telephoned West and told him that the balances for Shirley's account now reflected the return of the $75,000.

Shortly after this phone call from the defendant, West received a call from the manager of the Cralin branch where the defendant was employed. Following this conversation, West contacted Pru Bache concerning the missing $75,000. As a result of his discussions with Pru Bache, $75,000 plus interest was refunded to Shirley. The defendant sent a letter to West postmarked September 8, 1984, in which the defendant stated that he had covered the losses of another account with Shirley's money.

West testified that he had never given direct or indirect permission to the defendant to deposit checks payable to Shirley into Nathan's account, to use any of Shirley's money to pay off losses in someone else's brokerage account, or to loan any of Shirley's money to someone else. Shirley confirmed that he had not written and had not authorized anyone to write the endorsements "Robert Shirley" and "Don Nathan" which appear on the back of the three checks. He also stated that he had never authorized any loans from his account at

Pru Bache. Shirley indicated that the missing $75,000 was first brought to his attention by West. He did not remember when West reported this, but believed it was after his accounts were transferred to Cralin and soon after West discovered the problem.

Carolyn Denny, a special FBI agent, conducted two interviews of the defendant in September 1984. She took notes of these interviews on FBI 302 forms.[1] The defendant voluntarily provided his own two page statement setting forth his version of the events regarding the three $25,000 Pru Bache checks. During the interviews, the defendant admitted that he had written both the "Robert Shirley" endorsement and the "Don Nathan" endorsement. He further admitted that he had deposited each of these checks into his personal checking account.

The defendant was the Pru Bache account executive also responsible for the account of Tom Perry, who maintained his stock and commodities account and also a separate commodities account in the defendant's name. The commodities account (the "Nathan/Perry" account) was claimed by Nathan to be a nominee account; he contended that Perry directed the trading in the account and received all the benefit of the account. The defendant admitted that the nominee account was set up to circumvent Stock Exchange and SEC regulations concerning trades by a single individual. The funds in the account in Perry's name had been provided by Ken Graham. Perry managed the investments in the account in exchange for 10% of any profits.

In early February 1984, the Perry commodities account and the "Nathan/Perry" commodities account lost approximately $25,000 due to the failure to close out positions. Perry was trading in his commodities accounts more than the margin requirements permitted. (Perry thought he had a system to "beat" the market.) Nathan told Perry that payment of the losses had to be made very quickly due to margin payment deadlines. Perry replied that Gra-

---

1. An FBI 302 is a form routinely used to memo-      ralize an FBI interview of a witness.

ham was a millionaire and would supply the money but that he was out of town for a few days. Since Graham was unavailable, he and Perry attempted unsuccessfully to make trades to gain back Perry's losses.

Nathan claimed that within an hour of informing Perry of the losses, he received a phone call from West requesting that $25,000 be withdrawn from Shirley's money market account. Nathan could not be sure but believed that he hand carried the first check, dated February 15, 1984, to West who then returned it to him. Nathan claimed that based on casual remarks by West and Perry, he assumed that this $25,000 check was to be used to cover the losses in the Perry accounts as an informal loan from Shirley to Perry. There was no evidence that West ever specifically told the defendant that the money was to be used for Perry.

Nathan deposited the first $25,000 check into his personal checking account. He then purchased a cashier's check payable to Pru Bache which he used to pay the losses from Perry's commodities trading, since Pru Bache would not accept personal or third party checks.

A few days later, Nathan recalls that West again called Pru Bache and requested a second $25,000 withdrawal from Shirley's account. This telephone request was received by another broker who passed West's message on to the defendant. He then processed the check request form for the $25,000. Nathan mailed the check to West, who subsequently returned it in an envelope with other documents. Although West gave no specific instructions, Nathan claimed that he assumed that West intended this check to also be used to cover losses from the Perry account. Regarding the $25,000 transfer from Shirley's account to his wife's account, Nathan again stated that he assumed that West intended the funds to cover Perry's trading losses.

Nathan deposited the third $25,000 check into his personal checking account and used a portion of the proceeds to purchase a $15,000 cashier's check payable to Ken

Graham. This cashier's check was to cover Graham's withdrawal request.

Nathan denied that he had used any of the $75,000 from Shirley's account for his own personal benefit. Instead, he claimed that it was not until mid-April, 1984, that he realized his misinterpretation of West's intentions regarding Shirley's $75,000. The defendant admitted that he did not discuss this "misunderstanding" with West until many months later when he wrote him a letter concerning the transaction.

Pru Bache's Knoxville, Tennessee branch office manager, Kosofsky, testified that in late February 1984, he had the defendant write a memo for the file explaining the trading in the Perry commodities account and the "Nathan/Perry" commodities account:

During the weeks of 1/31/84 thru 2/10/84, I executed commodity trades in accounts 87118 ["Nathan/Perry" Account] and 01536 [Perry Account]. The trades for 01536 were all done following my solicitation of the client. The trades in 87118 are, of course, in my own account. . . .

Perry denied that he had ever authorized the defendant to open a nominee account on his behalf in Nathan's name and stated that he had never seen the statements for either the securities or commodities "Nathan/Perry" account or for the Don and Pat Nathan stock account. Perry did not discuss the problems in his Pru Bache accounts with Kosofsky. Nathan's motion for a bill of particulars was granted on a limited basis. Later, defendant unsuccessfully submitted a motion questioning the sufficiency of the government's bill of particulars.

## II. PRETRIAL DIVERSION

■ Prior to his indictment, defendant unsuccessfully requested pretrial diversion and was informed that the United States Attorney's Office for the Eastern District of Tennessee did not recognize pretrial diversion. Defendant then filed a Petition for Review of Denial of Pretrial Diversion with the district court, which was denied.

Defendant requests judicial review of the prosecution's denial of pretrial diversion. For support of this position, Nathan cites *United States v. Hicks*, 693 F.2d 32, 33 (5th Cir.1982), *cert. denied*, 459 U.S. 1220, 103 S.Ct. 1226, 75 L.Ed.2d 461 (1983). The *Hicks* court held that there should be a hearing on alleged violations by the defendant of the diversion agreement in order "to make sure that the government had lived up to its side of the bargain." *Id.* We do not find this case to be authority for defendant's position here. Nathan argues that if some court review of a prosecutor's refusal to grant pretrial diversion is not allowed, then a prosecutor might arbitrarily or discriminatorily refuse diversion.

The government asserts, on the other hand, that court review of a prosecutor's decision whether or not to prosecute would be an unconstitutional breach of the separation of powers between the judicial and executive branches of government, an impermissible intrusion into the prosecutor's discretionary function. *United States v. Renfro*, 620 F.2d 569, 574 (6th Cir.), *cert. denied*, 449 U.S. 902, 101 S.Ct. 274, 66 L.Ed.2d 133 (1980); *United States v. Dangler*, 556 F.Supp. 195, 198 (N.D.Ohio 1983). In *Hicks*, it was held that the defendant had no right to pretrial diversion. *Hicks*, 693 F.2d at 34.

There is no basis in this case for judicial interference with the prosecutor's discretion and authority to decide whether or not to pursue pretrial diversion. The defendant's motion was accordingly properly denied.

## III. GRAND JURY PROCESS

The defendant asserts that the district court denied the defendant minimum due process by not holding a hearing on the motion for production of grand jury records and the motion to dismiss the indictment due to grand jury abuse. The motions alleged that the government improperly subpoenaed two Pru Bache employees who subsequently turned over requested documents in order to avoid appearances before the grand jury.

In *United States v. Smith*, 687 F.2d 147, 152 (6th Cir.1982), *cert. denied*, 459 U.S. 1116, 103 S.Ct. 752, 74 L.Ed.2d 970 (1983), we held that the United States Attorney did not overreach his authority by requesting the issuance of a grand jury subpoena and by suggesting a voluntary production of a handwriting exemplar as a permissible alternative to a grand jury appearance by the witness. The court held that "[i]n order for this court to order a dismissal of an indictment as part of its supervisory powers, there must be a 'showing of demonstrated and longstanding prosecutorial misconduct' as well as a showing of 'prejudice to the defendant.'" *Id.* at 152–53. *See also United States v. Griffith*, 756 F.2d 1244, 1249 (6th Cir.), *cert. denied*, —— U.S. ——, 106 S.Ct. 114, 88 L.Ed.2d 93 (1985).

▬ The government's action in permitting the employees to submit documents in lieu of a grand jury appearance is the kind of conduct held not to be unconstitutional nor impermissible in *Smith*. The defendant, moreover, made no showing of prejudice due to any prosecutorial misconduct. Therefore, Nathan's due process rights were not violated by the denial of a hearing in this regard.

## IV. MOTION FOR PARTICULARS

The defendant asserts that the prosecution never defined the nature of the alleged fraudulent taking of the securities.[2] Na-

**2.** The statute, 18 U.S.C.A. § 2314 (1970), has several paragraphs. The bill of particulars of the government appears to specify paragraph one as the offense charged. The language "taken by fraud" and "converted" is used. The bill of particulars states that "the securities described in Counts 1, 2, and 3 of the Indictment were *taken by fraud* in that the defendant, without the knowledge or consent of the person to whom these checks were lawfully payable, *converted* said checks to his own use by endorsing and depositing the checks to his own bank account." (Emphasis added). Paragraph one of § 2314 reads:

Whoever transports in interstate or foreign commerce any goods, wares, merchandise, securities or money, of the value of $5,000 or more, knowing the same to have been stolen, converted or taken by fraud ... [s]hall be fined not more than $10,000 or imprisoned not more than ten years, or both.

than contends that the prosecution introduced proof during trial of three types of fraud: (1) forging the endorsement of a security, (2) theft of Shirley's money for the defendant's own personal use, and (3) false representations, dishonesty and deceit by the defendant in obtaining the securities. The bill of particulars, however, specified fraud by means of the forged endorsement. Appellant asserts therefore that the proof at trial was at variance with the bill of particulars and that a new trial should be ordered. Nathan also argues that the jury instruction should have incorporated only the allegations of the bill of particulars as elements of the offense.

In *United States v. Fruehauf Corp.*, 577 F.2d 1038 (6th Cir.), *cert. denied*, 439 U.S. 953, 99 S.Ct. 349, 58 L.Ed.2d 344 (1978), we discussed the standard for whether a variance between the particulars alleged in the indictment and the proof at trial is prejudicial. The court stated:

A variance is not to be regarded as material where it is not of a character which could have misled the defendant at the trial, *Berger v. United States*, 295 U.S. 78, 82, 55 S.Ct. 629 [630], 79 L.Ed. 1314 [ (1935) ]; or where it involves no element of surprise prejudicial to the efforts of the defendant to prepare his defense, *United States v. Ragen*, 314 U.S. 513, 526, 62 S.Ct. 374 [379], 86 L.Ed. 383, rehearing denied, 315 U.S. 826, 62 S.Ct. 620, 86 L.Ed. 1222 [ (1942) ]; or where it does not affect substantial rights. Rule 52(a), F.R. of Crim.P.; cf. *United States v. Haskins*, 345 F.2d 111, 114 (C.A.6 [1965] ). "Whether or not a variance is prejudicial is a judgment that must be made on the facts of each case." *United States v. Russano*, 257 F.2d 712, 715 (C.A.2 [1958] ).

*Id.* at 1057 (quoting *United States v. Mills*, 366 F.2d 512, 514 (6th Cir.1966)).

We hold that the proof at trial did not vary materially from the bill of particulars charge and, therefore, variance, if any, was not prejudicial. Failure to include the specifics of the bill of particulars in the jury charge was not error under the circumstances. See *United States v. Thet-*

*ford*, 676 F.2d 170, 183 (5th Cir.1982), *cert. denied*, 459 U.S. 1148, 103 S.Ct. 790, 74 L.Ed.2d 996 (1983); *United States v. Francisco*, 575 F.2d 815, 819 (10th Cir.1978); *United States v. Radetsky*, 535 F.2d 556, 565–67 (10th Cir.), *cert. denied*, 429 U.S. 820, 97 S.Ct. 68, 50 L.Ed.2d 81 (1976); *Pipkin v. United States*, 243 F.2d 491, 494 (5th Cir.1957). We are satisfied that the defendant was fully apprised of the nature of the fraud involved which included deceit, misrepresentation, and false endorsement. We find the variance in the proof, if any, did not affect defendant's substantial rights. We therefore decline to set aside the convictions on the basis of this challenge.

## V. EVIDENCE OF OTHER MISCONDUCT

Defendant contends that it was reversible error to permit evidence which indicated he was guilty of uncharged misconduct in respect to stock trading and the handling of customer accounts. The evidence in question involved a memo written by defendant, testimony of the Pru Bache branch manager, and testimony by Perry about unauthorized trades in his account by Nathan, particularly the "Nathan/Perry" account. This evidence, however, was unquestionably relevant and material with respect to showing the background and circumstances of Nathan's conduct at Pru Bache with regard to the checks which were the subject matter of the indictment. The evidence contradicted defendant's contentions about lack of any fraudulent intent, and about the expected benefit or lack thereof, derived by Nathan in respect to his dealing in the "Nathan/Perry" account and his need to utilize the check proceeds in question due to losses incurred. We believe the evidence involved material admissions by Nathan with respect to his course of dealing at Pru Bache and bore directly upon his credibility, particularly regarding his intent at the times in question. We therefore find no reversible error in the admission of this evidence. In further support of our ruling, we note the absence of objection by defendant to some of the evi-

dence which he now claims to be unduly prejudicial. See F.R.E. 103(a)(1).

## VI. DISCOVERY OF FBI NOTES

Defendant vigorously asserts that the failure to disclose to him FBI interview notes, the so-called 302 forms, was significantly prejudicial and should mandate a setting aside of the guilty verdicts. The interview notes of government witnesses, taken by FBI agent Denny, are referred to as "statements" by defendant. Since the agent testified that the 302s are an accurate reflection of what the interviewee said, and because she had reviewed these notes or reports before the testimony, Nathan maintains that the FBI 302 reports come within the requirements of the Jencks Act, 18 U.S.C.A. § 3500 [3], and should have been produced.

Following Denny's testimony at trial, defense counsel moved for production of the agent's notes on the grounds that they were "Jencks statements of witnesses who were interviewed", (2) they were Jencks statements of the agent, and (3) they had been used to refresh the agent's recollection (see Defendant/Appellant Brief, p. 22). The district court held, without a hearing, that the materials were not Jencks "statements" and were not then required to be turned over to defendant's counsel. Later, defendant's counsel again moved for these materials in controversy after the further testimony of West, Denny, and Perry.

Defendant contends further that failure to have a hearing in respect of his motions for production at trial was reversible error since he was denied the opportunity to examine the notes.[4] He relies on an additional ground for production, that agent Denny was present during the prosecution's pretrial interviews with these same witnesses regarding the same subject matter of the 302 reports. The district court found, however, that Denny did not read the notes back to the witnesses, nor have the witnesses read the notes, "nor in any way confirm that the notes were an accurate verbatim recording of the witnesses' statements."

One purpose of the Jencks Act is to prevent "the undiscriminating production of agent's summaries of interviews regardless of their character or completeness." *Palermo v. United States,* 360 U.S. 343, 350, 79 S.Ct. 1217, 1223, 3 L.Ed.2d 1287 (1959). Indeed, it would "be grossly unfair to allow the defense to use statements to impeach a witness which could not fairly be said to be the witness' own rather than the product of the investigator's selections, interpretations and interpolations." *Id.* This risk does not exist, however, "where a witness has adopted or approved" the agent's notes. *Goldberg v. United States,* 425 U.S. 94, 107, 96 S.Ct. 1338, 1346, 47 L.Ed.2d 603 (1976).

▮▮▮ We have previously held that an FBI report of a witness' statement is pro-

---

**3.** The Jencks Act sets out in pertinent part:

§ 3500. **Demands for production of statements and reports of witnesses**

(a) In any criminal prosecution brought by the United States, no statement or report in the possession of the United States which was made by a Government witness or prospective Government witness (other than the defendant) shall be the subject of subpena [sic], discovery, or inspection until said witness has testified on direct examination in the trial of the case.

(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (*as hereinafter defined*) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified....

....

(e) The term "statement", as used in subsections (b), (c), and (d) of this section in relation to any witness called by the United States, means—

(1) a written statement made by said witness and signed or otherwise adopted or approved by him;

(2) a stenographic, mechanical, electrical, or other recording, or a transcription thereof, which is a substantially verbatim recital of an oral statement made by said witness and recorded contemporaneously with the making of such oral statement; or

(3) a statement, however taken or recorded, or a transcription thereof, if any, made by said witness to a grand jury.

**4.** The district court did, however, conduct an *in camera* examination of the requested materials, and found that they contained "impressions of the interviewing FBI agent."

ducible if the notes from the interview were read back to and verified by the witness and if the report summarized the notes without material variation. *United States v. Chitwood*, 457 F.2d 676, 678 (6th Cir.), *cert. denied*, 409 U.S. 858, 93 S.Ct. 141, 34 L.Ed.2d 103 (1972). Under § 3500(e)(2) a substantially verbatim recital of an oral statement made by a witness will suffice if recorded contemporaneously. *United States v. McKeever*, 271 F.2d 669, 674–75 (2d Cir.1959). In *Padin*, we upheld the denial of production of a DEA agent's debriefing report summarizing a witness' interview because only parts of the interview were recorded and because the witness never adopted the report by signing it, reading it, or having it read to her. *United States v. Padin*, 787 F.2d 1071, 1077–78 (6th Cir.), *cert. denied*, — U.S. —, 107 S.Ct. 93, 93 L.Ed.2d 45 (1986). Also, testimony was given that the agent exercised editorial discretion in the report by recording only statements to which he assigned importance. *Id.* at 1078. The trial court's ruling on such matters is subject to a clearly erroneous standard. *Chitwood*, 457 F.2d at 678.

■ Even though Agent Denny expressly testified that she accurately summarized all of the witness' statements in her reports, the fact remains that the witness never saw the report or had it read to them for adoption. Any biases or preconceptions of the agent while taking notes and completing the 302 reports would not necessarily have been corrected when the witnesses were subsequently interviewed by the prosecutors in the presence of the agent. The only method to ensure that the agent's notes accurately detailed the witness' statements is to follow the procedure detailed in *Chitwood* of having each witness read or verbally approve the applicable statement when read to him. *See Goldberg v. United States*, 425 U.S. at 110–11 n. 19, 96 S.Ct. at 1348 n. 19. Therefore, since the notes were never shown, read or explained to the witnesses, they were never adopted as a statement and are not producible under § 3500(e)(1). *Padin*, 787 F.2d at 1078; *United States v. Hogan*, 763 F.2d 697, 704 (5th Cir.1985); *United States v. Goldberg*, 582 F.2d 483, 487 (9th Cir.1978), *cert. denied*, 440 U.S. 973, 99 S.Ct. 1538, 59 L.Ed.2d 790 (1979); *United States v. Harris*, 542 F.2d 1283, 1292 (7th Cir.1976), *cert. denied*, 430 U.S. 934, 97 S.Ct. 1558, 51 L.Ed.2d 779 (1977).

■ Nor do the reports appear to be substantially verbatim recitals of a witness' oral statements. After careful inspection of the documents, we are not prepared to find the district court's decision to disallow production of the statements to be clearly erroneous. *See Padin*, 787 F.2d at 1078; *Hogan*, 763 F.2d at 703.

■ Neither do the documents become Jencks Act material simply because the agent may have used them to refresh her recollection prior to taking the stand. *Goldman v. United States*, 316 U.S. 129, 132, 62 S.Ct. 993, 994, 86 L.Ed. 1322 (1942), *overruled on other grounds, Katz v. United States*, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *United States v. Soto*, 711 F.2d 1558, 1561–62 (11th Cir.1983); *United States v. Atkinson*, 513 F.2d 38, 41 (4th Cir.1975); *Spurrier v. United States*, 389 F.2d 367, 368 (5th Cir.1967), *cert. denied*, 391 U.S. 922, 88 S.Ct. 1814, 20 L.Ed.2d 658 (1968); *McGill v. United States*, 270 F.2d 329, 330–31 (D.C.Cir.1959), *cert. denied*, 362 U.S. 905, 80 S.Ct. 615, 4 L.Ed.2d 555 (1960); *Tillman v. United States*, 268 F.2d 422, 424–25 (5th Cir.1959); *Needelman v. United States*, 261 F.2d 802, 806–07 (5th Cir.1958), *cert. dismissed*, 362 U.S. 600, 80 S.Ct. 960, 4 L.Ed.2d 980 (1960); *Lambert v. United States*, 261 F.2d 799, 802 (5th Cir.1958).

Denny's testimony regarding her interviews with Nathan did relate to the subject matter of her notes and her report and bore upon what Nathan had related to her previously in response to Denny's questions about his activity. Nathan's interview reports were, however, turned over to the defense prior to trial. Even if the notes and other witness reports were found to relate to Denny's testimony, the language of § 3500(b), however, requires production of "any *statement* of the witness ... which relates to the subject matter as

to which the witness has testified." (Emphasis added). The problem is whether the 302 forms or the notes of the FBI agent concerning her interviews in and of themselves might constitute a "statement" within the meaning of the Act. The reports clearly state "This document contains neither recommendations nor conclusions of the FBI." Also, the notes merely appear to be questions and brief notations of answers. We have already discussed reasons that persuade us that the 302 forms and notes are not statements of Nathan or other witnesses, which are required to be discovered. We have difficulty construing the interview notes and reports as a "statement" of FBI agent Denny. Assuming, however, that they were so construed, we would next determine whether the error in refusing to turn this information over to defendant's counsel was harmless beyond a reasonable doubt after a careful reexamination of the material and in light of the entire record. *See Rose v. Clark,* —— U.S. ——, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986).

■ If the notes were used by the agent to refresh her recollection of the interviews with Nathan, then perhaps the agent might properly have been called upon to produce the notes for purposes of proper cross-examination. *See* Fed.R.Evid. 612(2). *See generally United States v. Larranaga,* 787 F.2d 489, 501 (10th Cir. 1986); *United States v. Howton,* 688 F.2d 272, 276 (5th Cir.1982); *United States v. Costner,* 684 F.2d 370, 373 (6th Cir.1982).

Our examination reveals that the materials in question were not exculpatory in nature; they involved inconsistent versions of events and the giving of conflicting reasons by Nathan for his actions and inactions upon questioning by the FBI.

Assuming, without deciding this difficult question, that the district court abused his discretion in not ordering the prosecution to turn over the material under Fed.R.Evid. 612, we are satisfied, nevertheless, that the error, if any, was harmless after consideration of the abundant proof of defendant's guilt in the record and taking into account the totality of the circumstances. *Rose,* 106 S.Ct. at 3105–07; *Delaware v. Van*

*Arsdall,* 475 U.S. 673, 106 S.Ct. 1431, 1436–38, 89 L.Ed.2d 674 (1986); *Chapman v. California,* 386 U.S. 18, 24, 87 S.Ct. 824, 828, 17 L.Ed.2d 705 (1967).

In this instance we have read carefully the sealed notes and reports, and have compared them with the testimony of Denny. We therefore AFFIRM the district court's judgment.

MERRITT, Circuit Judge, dissenting.

Although I agree with the Court's disposition of this appeal in Parts I through V of the Court's opinion, I disagree with Part VI. The "302" forms referred to and described in the opinion appear to me to fall within the definition of a statement under § 3500(e)(2) and should, therefore, have been made available to the defendant for examination. Accordingly, I would reverse the conviction and remand the case for a new trial because the District Court erred in failing to require the government to turn over these statements.