66 F.3d 326
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
UNITED STATES of America, Plaintiff-Appellee,
v.
David L. HYATT; Peter David McBean, Defendants-Appellants.
 Nos. 94-3133, 94-3986.
 United States Court of Appeals, Sixth Circuit.
 Sept. 12, 1995.
 
 Before: BROWN, MILBURN, and NORRIS, Circuit Judges.
 PER CURIAM.
 
 
 1
 Defendants David Hyatt and Peter McBean appeal their convictions and sentences for conspiracy to possess and distribute cocaine in violation of 21 U.S.C. Sec. 846. Hyatt faces life imprisonment, and McBean faces 236 months. For the following reasons, we AFFIRM the defendants' convictions and sentences.
 
 I.
 
 2
 Hyatt's and McBean's convictions arose from a wide-ranging conspiracy to supply the citizens of Akron, Ohio, with cocaine. According to the indictment, the conspiracy lasted from the fall of 1990 to at least April 10, 1992. On April 10, Desmond Fennell and several other coconspirators were caught transporting twenty kilograms of cocaine from New York to Akron.
 
 
 3
 From the evidence presented at trial, there is little doubt that the alleged conspiracy existed. Several conspirators pled guilty and testified for the government. Furthermore, there was substantial physical evidence, including large amounts of cocaine as well as telephone and financial records. Generally speaking, in addition to serving other locales, Hyatt would sell large quantities of cocaine to Akron dealers through McBean or Fennell. Indeed, Hyatt said on more than one occasion that he would "supply all the cocaine they could move." We shall discuss the facts more specifically as the need arises.
 
 II.
 
 4
 In his appeal, Hyatt raises two main issues, which we shall address in turn.
 
 A.
 
 5
 Hyatt first challenges the district court's decision to admit evidence seized from Hyatt's many residences. After Desmond Fennell and the other coconspirators were arrested, they incriminated Hyatt, which led to the issuance of search warrants for five of Hyatt's residences in New York City and Miami. The investigators did not act on these search warrants right away, however, because Hyatt was out of the country, and there was some fear that he would not return if he discovered that he was the subject of an investigation. After he returned fifteen months later, the search warrants were reissued and the investigators searched the homes. These searches, in turn, led to the search of two additional residences.
 
 
 6
 Hyatt argues on two fronts that there was not probable cause to issue the search warrants. First, he claims that there was an insufficient nexus between the alleged drug activity and each residence. Second, he argues that even if there was probable cause at the time his coconspirators were arrested, the information contained in the affidavits was fifteen months old and thus stale at the time the reissued search warrants were finally executed. Even if these contentions are correct, however, Hyatt must still show that the conduct of the investigators who obtained the reissued warrants and searched the residences fell outside the good-faith exception to the exclusionary rule. In other words, he must show that the affidavits were "so lacking in indicia of probable cause as to render official belief in [their] existence totally unreasonable." United States v. Leon, 468 U.S. 897, 923 (1984).
 
 
 7
 Hyatt cannot make this showing. At the time the investigators received the relevant affidavit information, there was indeed some nexus between the drug activity and the residences such that there was a probability that relevant records or documents (such as address books), if not drugs, would be found there. See J.A. at 407-08, 416-17. Moreover, in light of the massive scope of the alleged conspiracy, the affidavits were not obviously stale when the warrants were executed fifteen months after the conspiracy alleged in the indictment had ended. Thus, they were not "so lacking in indicia of probable cause as to render official belief in [their] existence totally unreasonable."[1] Leon, 468 U.S. at 923. This is sufficiently demonstrated by the fact that, before the searches were carried out, three different magistrate judges approved the searches relying basically on the same affidavits. The district court did not err in admitting evidence seized as a result of these searches.
 
 B.
 
 8
 Hyatt also claims that the district court erred by failing to conduct a more extensive hearing to determine if the government withheld statements of a witness, Eual Wallace, in violation of the Jencks Act, 18 U.S.C. Sec. 3500(b). We review the district court's ruling in this regard under a clearly erroneous standard. United States v. Arnold, 890 F.2d 825, 830 (6th Cir.1989).
 
 
 9
 The Jencks Act requires the government to produce (1) any statement of a witness that is (2) in its possession and that (3) relates to the subject matter as to which the witness has testified. 18 U.S.C. Sec. 3500(b); United States v. Susskind, 4 F.3d 1400, 1404-05 (6th Cir.1993), cert. denied, 114 S.Ct. 1098 (1994). In order for notes prepared by a government investigator to be "statements" of a witness, the notes must be "signed or otherwise adopted or approved" by that witness. Goldberg v. United States, 425 U.S. 94, 98 (1976). In a series of cases, we have held, applying the "adoption test," that a witness adopts government notes when they are "read back to and verified by the witness." E.g., Arnold, 890 F.2d at 829; United States v. Nathan, 816 F.2d 230 (6th Cir.1987); United States v. Chitwood, 457 F.2d 676 (6th Cir.), cert. denied, 409 U.S. 858 (1972). The facts giving rise to the Jencks Act controversy are as follows. Wallace, a government witness, was arrested for attempting to transport 648 kilograms of cocaine from California to New York. At trial, he testified that Hyatt had an interest in this cocaine. He also admitted, on cross-examination, that he made no mention of Hyatt during the interrogation following his arrest because, he further testified, he wanted to protect his brother, who was also involved with Hyatt. He further stated that the agents took notes throughout this interrogation.
 
 
 10
 At trial, when Hyatt learned that the agents took notes, he requested that they be turned over as statements under the Jencks Act. The district court then stopped the cross-examination of Wallace and ordered the assistant U.S. attorney who was trying the case to determine whether the notes in fact existed. The next day, that attorney reported the following to the court:
 
 
 11
 Your Honor, I did speak with AUSA [in Los Angeles] personally yesterday afternoon following the conclusion of Court. He advised me that he is not in possession of any written reports concerning statements of Mr. Wallace. He further checked with the customs agent who is the federal agent that was involved in that particular investigation in an adoptive basis. And he again indicated to me that the agent reported that there were no written reports of any interviews relating to Mr. Eual Wallace.
 
 
 12
 J.A. at 1187. There were, apparently, related prosecutions occurring in the Central District of California.
 
 
 13
 Hyatt's counsel then questioned Wallace concerning the manner in which the interrogation was conducted:
 
 
 14
 Q. And they would be constantly writing down the things you would be saying?
 
 
 15
 A. Yeah.
 
 
 16
 Q. And they would mention back to you and ask questions, let me see if I have this right, and then they would ask you if you said certain things?
 
 
 17
 A. Right.
 
 
 18
 Q. And you would agree that you did say it or you didn't say it?
 
 
 19
 A. Right.
 
 
 20
 J.A. at 1222. The district court then asked Wallace if he had signed anything other than the plea agreement or seen any reports that purported to be summaries of his statements. Wallace responded in the negative. J.A. at 1224-25.
 
 
 21
 Hyatt then requested that Wallace's testimony be stricken because the government had failed to produce Jencks Act material. The district court denied the motion and ruled that the notes were not producible under the Jencks Act because (1) the notes were not statements of the witness because there was insufficient evidence to show that Wallace adopted those notes, and (2) the notes were not in the possession of the United States because there was insufficient evidence to show that the notes currently existed. J.A. at 1237.
 
 
 22
 We believe that, on the evidence that was then presented to the district court, we cannot say that the court was clearly erroneous in its determination that the statement so taken from Wallace did not satisfy the Jencks Act. Wallace never testified that he saw what the agents wrote down; he only was asked whether he had "said certain things" and he would "agree that you did say it or didn't say it." See Nathan and Chitwood, infra.
 
 
 23
 With regard to whether the district court clearly erred in concluding that the United States did not possess the notes, we are faced with an unusual situation. As noted above, the government attorney trying this case represented to the court that his office did not have the notes, and that, upon inquiry made by direction of the court, neither did the Los Angeles U.S. Attorney's Office. In his brief, however, Hyatt contends that reports summarizing the agents' notes are, in fact, in the possession of the Los Angeles U.S. Attorney's Office and that the notes themselves were in the government's possession at the time of Hyatt's trial.[2] In its brief, the government does not dispute this contention.
 
 
 24
 The fact remains, however, that at the time the district court determined that the government did not possess the notes, the only information it had before it was the government counsel's representations to that effect. Moreover, and despite the defendant's allegations in its brief, this is the only information we have regarding this issue that is properly a part of this record. Therefore, we must hold, based only on the record properly before us, that the district court did not clearly err in ruling that the government did not possess at the time of the trial any statements of Wallace.
 
 
 25
 As for the defendant's new allegations concerning the notes and reports, these could apparently be addressed in a proceeding under 28 U.S.C. Sec. 2255. We do note, however, that these allegations may turn out to be unavailing. Wallace admitted at trial on cross-examination that while he did not tell the agents about Hyatt when he was interrogated, his reason was that he did not want to implicate his brother. This explanation may significantly undercut any impeachment value the notes might have had. See Susskind, 4 F.3d at 1406 (holding that violations of the Jencks Act are subject to a "strictly applied" harmless error analysis).
 
 III.
 
 26
 In his appeal, McBean contends that the district court abused its discretion by admitting into evidence the April 10 arrest of Fennell and the other conspirators. He also contends that the district court abused its discretion by admitting into evidence proof that McBean was stopped by authorities in the Cleveland-Hopkins airport with $30,000 in cash. McBean argues that this evidence was not relevant and that its unfair prejudicial effect outweighed its proper probative value. These contentions are meritless. The April 10 arrest was relevant because it tended to show the size and scope of the conspiracy. McBean's possession of $30,000 in cash was also relevant because it tended to show McBean's involvement in the Akron conspiracy. Moreover, the district court did not abuse its discretion in concluding that the evidence's unfair prejudicial value did not outweigh its proper probative effect.
 
 IV.
 
 27
 We have carefully examined the other issues raised by the defendants and conclude that they merit no discussion. For the above reasons, we AFFIRM the convictions and sentences of McBean and Hyatt.
 
 
 
 [1]
 Inasmuch as we hold that the evidence was admissible under the Leon exception because the officers serving the warrants could reasonably believe there was probable cause, we need not address the questions of whether there was actual probable cause to issue the warrants initially, and whether the affidavits were actually stale when the warrants based on those affidavits were finally executed
 
 
 [2]
 Specifically, Hyatt's brief states:
 the government will not deny that, well after the end of Hyatt's trial, the assistant United States attorney in Los Angeles acknowledged that reports summarizing Wallace's debriefings were then in existence, but, he states, had not been in existence at the time Hyatt was tried. Since Wallace was interviewed three or four times before Hyatt's trial, and the law enforcement officers took notes during those interviews, and reports were generated after Hyatt's trial, it is inconceivable that the notes, at least, were not in existence at the time of Hyatt's trial. Hyatt's counsel has requested but not received the reports and notes.
 Defendant's Brief at 34 n. 47.