COMMONWEALTH vs. JOHN DOE.

Norfolk. October 2, 1990. - December 10, 1990.

Present: LIACOS, C.J., WILKINS, ABRAMS, & O'CONNOR, JJ.

*Grand Jury. Practice, Criminal*, Grand jury proceedings. *Contempt. Constitutional Law*, Grand jury.

Statement of the limits on a grand jury's power to seek a court order obliging a person to appear involuntarily in a lineup. [767-770]

This court concluded that, upon balancing the public interest in the investigation by grand juries of criminal conduct against the rights of citizens to be free from unreasonable intrusions on their privacy, the record of a grand jury proceeding presented a reasonable basis for a court's ordering a certain John Doe to participate in a lineup. [770-771]

ADJUDICATION of contempt in the Superior Court Department on November 17, 1989.

The case was heard by *Andrew Gill Meyer*, J.

The Supreme Judicial Court granted a request for direct appellate review.

*Carol A. Donovan*, Committee for Public Counsel Services, for the defendant.

*Judith A. Cowin*, Assistant District Attorney, for the Commonwealth.

WILKINS, J. The defendant, held in contempt of court for failure to comply with an order that he appear in a lineup sought by a Norfolk County grand jury, argues that the order violates his constitutional rights. We disagree and hold that the contempt order was lawful.

We summarize the evidence before the grand jury, presented through a detective sergeant in the Walpole police department. About 5:15 A.M. on September 13, 1989, a man assaulted a woman on Main Street in Walpole. She de-

scribed her attacker as a white male in his twenties, about five feet ten inches tall with short blond hair, who was wearing a dark T-shirt with white letters on the back. An employee of a pizza shop in the vicinity told a policeman that a man wearing such a T-shirt had just used a pay telephone in front of a nearby store. The employees of the shop were suspicious that the man had made obscene phone calls to the shop that morning. Another employee reported that shortly after 5:05 A.M. she had seen a man wearing such a T-shirt walking on Main Street and also had seen a man and woman walking on Main Street, the woman being about one hundred yards in front of the man. The woman was the victim of the assault; the man following her was her husband. Two employees of the shop decided to follow the man wearing the T-shirt by motor vehicle to see what he was doing. At the top of a hill on Main Street by a bridge they found the husband holding his wife. The woman said that a man fitting the description of the man at the pay telephone near the pizza shop had pulled her to the ground and had assaulted her sexually.

The husband told the police that he and his wife had been on their customary early morning walk, his wife had a head start, and she was about one hundred yards ahead of him when he saw a man cross the street behind his wife and run up behind her. He also ran toward her. When he reached them, the man was sitting on his wife, yelling for her to shut up. The man ran away after he broke free from the husband. The employees of the pizza shop then arrived and drove the victim and her husband to the police station.

Shortly after 4:30 A.M., a woman had called the Walpole police to report that she had just received an obscene telephone call from a man whom she named, and we shall call John Doe in this opinion. This was not the first such telephone call John Doe had made to the woman. As a result of that telephone call, and the description of the attacker, police officers, unfortunately, mentioned John Doe's name to the victim and her husband. The police knew John Doe lived nearby.

The police prepared an array of eight photographs, including a recent photograph of John Doe, whose hair was considerably longer than it was at the time of the assault. The victim, whose glasses had been knocked off, told the police that she would not be able to identify her attacker. Her husband pointed to John Doe's picture, identified him as John Doe, and said "his hair is too long." He said that he had not seen John Doe for a long time. The husband said that he knew he could identify the attacker if he saw him face to face. He did not, however, say that John Doe was the attacker.

The police then interviewed John Doe, who said that, after spending much of the night at a bar, he had fallen asleep at home watching television sometime after 2:30 A.M. He denied making any of the telephone calls to which we have referred. He said that that night he had worn a white sweat shirt with orange lettering and showed it to the police. He denied that he had left his house early that morning. What John Doe said he had done that night was largely confirmed by two people who were with him during portions of the night. One of these people described John Doe as "all wound up" when he left John Doe at Doe's home about 3 A.M.

Based on this evidence, an assistant district attorney asked the grand jury to request a court order that John Doe appear in a lineup to be viewed by witnesses in the case. On October 25, 1989, the grand jury did make such a request and, on November 2, 1989, after hearing both parties, a judge of the Superior Court ordered John Doe to stand in a lineup at a time and place to be determined by the district attorney's office. The judge also ordered that necessary reasonable force could be used if John Doe refused to consent to participate in the lineup.[1]

---

[1]John Doe thereupon sought relief from a single justice of this court under G. L. c. 211, § 3 (1988 ed.). On November 9, 1989, a single justice denied relief with one exception. He ordered that the authorization to use reasonable force be deleted from the order. The Commonwealth has not appealed from the single justice's order, and his action is not before us. We, therefore, decline the Commonwealth's request that we consider restoring to the order the right to use reasonable force.

John Doe declined to comply with the order. He was then ordered to be committed to the custody of the sheriff for contempt of court, but his commitment was stayed pending appellate review. We granted the defendant's application for direct appellate review.

John Doe argues first that the order to appear at a lineup violated his due process rights under art. 12 of the Massachusetts Declaration of Rights and under the Fourteenth Amendment to the Constitution of the United States. His claim is that the lineup would involve unnecessary suggestiveness because the police already have mentioned John Doe as a suspect to the victim's husband, who had known John Doe before, and have shown the husband a picture of John Doe. The question whether the lineup will fail to produce reliable identification evidence is not appropriate for decision at this time. Until the lineup takes place, the victim's husband makes a positive identification (if he does), John Doe is indicted, and an evidentiary hearing is held on a motion to suppress the identification, the question need not be considered.[2]

John Doe's second argument is more significant. He contends that the order that he appear in a lineup violates his right under art. 14 of the Massachusetts Declaration of Rights to be free from unreasonable searches and seizures. He concedes that "under the Fourth Amendment [to the Constitution of the United States], as interpreted in *United States* v. *Dionisio*, 410 U.S. 1 (1973), a grand jury subpoena requiring a subject to produce physical evidence does not qualify as a 'seizure,' " and hence he makes no argument based on the Fourth Amendment. See *In re Melvin*, 550 F.2d 674, 676 (1st Cir. 1977) ("being forced to stand in a lineup does not result in an unconstitutional 'seizure' ").

---

[2]We add that, on the grand jury record before us, we could not fairly say that any identification of John Doe by the victim's husband would be inadmissible as a matter of law. We do not suggest that the record should or could have been fuller on the suggestiveness question. We are simply opposed to pre-indictment evidentiary hearings concerning the alleged suggestiveness of identification procedures not yet conducted.

This argument raises the question whether there are any limits on a grand jury's power to seek a court order obliging a person to appear involuntarily in a lineup. Although grand juries have broad authority to conduct inquiries (*Branzburg v. Hayes*, 408 U.S. 665, 688 [1972]), they may not override constitutional rights, such as the right against self-incrimination (*Powers v. Commonwealth*, 387 Mass. 563, 564-565 [1982]), and may not issue unreasonable orders to produce documents (*Hale v. Henkel*, 201 U.S. 43, 76 [1906]). While John Doe's argument is expressed in constitutional terms, the standard that should guide a judge in passing on the lawfulness of an identification order need not be constitutionally based. Some States by statute or by court rule have established standards for identification detention, which require that there be reasonable cause or reasonable grounds (not necessarily probable cause) to believe that the individual committed the offense. See, e.g., Ariz. Rev. St. Ann. § 13-3905 (1989);[3] Colo. R. Crim. P. 41.1 (c) (2);[4] Idaho Code § 19-625(1)(B) (1987); N.C. Gen. Stat. § 15A-273(2) (1983); Utah Code Ann. § 77-8-1(1) (1990).[5]

The law of the Commonwealth should not permit a grand jury, supported by a judicial order, to direct a person to ap-

---

[3]The statute's constitutionality under the Fourth Amendment was upheld in *State* v. *Grijalva*, 111 Ariz. 476, cert. denied, 423 U.S. 873 (1975). The court construed the statute to require a showing of "reasonable cause." *Id.* at 480.

[4]In *People* v. *Madson*, 638 P.2d 18, 31-33 (Colo. 1981), the court considered the constitutionality of its rule that allowed the seizure of a person to obtain nontestimonial identification evidence if there were reasonable grounds to suspect the person committed the offense. The court upheld the rule under the State and Federal Constitutions. *Id.* at 33.

[5]These standards are substantially similar to the standard stated as the proper basis for the issue of a nontestimonial identification order in § 170.2(6), (b), of A Model Code of Pre-Arraignment Procedure (1975) of the American Law Institute. An official shall issue such an order only if, among other things, he finds that "(b) there are reasonable grounds to suspect that the person named or described in the affidavit may have committed the offense and it is reasonable in view of the seriousness of the offense to subject him to the specific identification procedures set forth in the application."

pear in a lineup without any articulable justification. A standard of reasonableness should guide a judge in deciding whether, in his discretion, to direct a person to appear at a lineup ordered by a grand jury. The judge need not hold an evidentiary hearing on the grand jury's request and may decide the issue solely on the basis of the evidence presented to the grand jury. One question for the judge will be whether there is a "reasonable suspicion" that the person subject to the order committed a crime under grand jury investigation. See *Terry* v. *Ohio*, 392 U.S. 1 (1968). Such a standard will satisfy the requirements of art. 14 that any search or seizure must be reasonable.[6]

The intrusiveness of an order that a person appear in a lineup requested by a grand jury is sufficiently great so as to require that there be a reasonable basis for issuing and enforcing such an order. A summons to appear to testify before a grand jury or to produce documents generally is not as intrusive, nor do those circumstances have the same likely stigma associated with them, as does an order to appear in a lineup. We, therefore, prescribe a showing of reasonable suspicion to support a grand jury's lineup order, while not doing so generally with respect to other grand jury orders directed to an individual concerning nontestimonial evidence.

We reject, however, the imposition of any higher standard. If, to protect constitutional rights, courts discourage one-on-one identification procedures, courts should not place undue burdens on the use of lineups in law enforcement. Thus, we do not require that an order to appear in a lineup must be supported by probable cause, as one court has done. *In re Armed Robbery*, 99 Wash. 2d 106, 109 (1983).[7] Such a rule would unreasonably limit the functioning of a grand jury.

---

[6] We need not decide whether under art. 14, as under the Fourth Amendment, an order to engage in an identification procedure, backed by a threat of contempt of court for noncompliance, fairly can be said not to involve a "seizure."

[7] This opinion is not conceptually well-ordered. The court states that an order that Mr. T appear at a physical lineup "violated the federal and state constitutions because it constituted a seizure of Mr. T on less than

What we do here under the common law and our general superintendence authority is similar to what the District of Columbia Court of Appeals did pursuant to its supervisory power in *Matter of Kelley*, 433 A.2d 704, 707 (D.C. 1981). That court distinguished orders for lineups from less threatening orders to produce voice (*United States* v. *Dionisio*, 410 U.S. 1 [1973]) and handwriting exemplars (*United States* v. *Mara*, 410 U.S. 19 [1973]). *Id.* at 706.[8] It announced that "to insure that the prosecutor and grand jury are acting in good faith and not arbitrarily or to harass putative defendants," the prosecutor must "make a minimal factual showing sufficient to permit the judge to conclude that there is a reason for the lineup which is consistent with the legitimate function of the grand jury." *Id.* at 707.

Although the question is close, the grand jury record here presents evidence warranting a reasonable suspicion, but certainly not probable cause, to believe that John Doe committed the crime. John Doe had a record of making obscene telephone calls. He made one at about 4:30 A.M. on the day of the attack and other such calls were made to the pizza shop shortly thereafter, possibly by a man who was seen in the vicinity of the pizza shop and dressed in the same kind of T-shirt as was the attacker. The victim's description of the attacker fit John Doe, who lived in the neighborhood. We recognize that, because John Doe lived in the neighborhood

---

probable cause." *Id.* at 107. The opinion does not cite *United States* v. *Dionisio*, 410 U.S. 1, 9 (1973), that suggests that no seizure in a Fourth Amendment sense would be invoked in such an order, a position explicitly stated in *In re Melvin*, 550 F.2d 674, 677 (1st Cir. 1977).

There may be little sense in a rule that says that a grand jury must already have grounds to indict a person (i.e. probable cause) before it may order that person to appear in a lineup.

[8]"A line-up appearance is not simply showing one's face to the public. It involves considerable social stigma and personal risk. It entails the humiliation of standing on a stage under floodlights, removed from counsel, subject to being compelled to speak certain words and perform actions directed by the police, all at considerably more risk of mistake and misidentification than the more scientifically grounded fingerprinting and, to some extent, voiceprinting techniques involved in *Dionisio* and *Mara*." *Id.*

and had had previous dealings with the police and was, therefore, a logical suspect, the police may have singled him out for those reasons, reasons that do not alone constitute reasonable suspicion that John Doe may have committed the crime. Balancing the public interest in the investigation by grand juries of criminal conduct against the rights of citizens to be free from unreasonable intrusions on their privacy, we conclude that there was a reasonable basis for ordering John Doe to participate in a lineup.

The modified order that John Doe participate in a lineup is lawful. The judgment of contempt is affirmed.

*So ordered.*