Kane, Robert J., J.
Facing indictments for assault and battery with a dangerous weapon, armed assault with intent to murder and first degree murder, the defendant, Brandon Callender, moves to suppress statements gathered by the Commonwealth, pursuant to G.L.c. 277, §68. He maintains that subpoenaing records of his telephone conversations while housed at the Suffolk and Bristol County Houses of Correction contravened G.L.c. 277, §68 and violated his privacy rights protected under the United States and Massachusetts Constitutions.
As an independent ground for suppressing the records, Callender contests the authority of the Suffolk County and Bristol County Sheriffs’ Departments to intercept, record and retain the calls. The Sheriffs claim that the regulations on detainee telephone calls serve valid penological interests, but Callender argues that those interests fail to constitute a reasonable basis for recording, monitoring and retaining records of a pretrial detainee’s private telephone conversations.
Based on the findings of fact and rulings of law, this court is satisfied that the recording and monitoring of detainee calls served valid penological interests and did not violate Callender’s privacy rights protected under the United States and Massachusetts Constitutions. Additionally, the court finds and rules that the *50 grand jury subpoenas failed to conform with G.L.c. 277, §68 but that the violation was not committed in bad faith and failed to amount to a violation of any constitutional right. Due to the absence of a constitutional violation or bad faith the court declines to suppress the subpoenaed material because of the statutory violation. Finally, the court determines that the subpoenas’ facial overbreadth can be remedied by discrete excisions.
FINDINGS OF FACT
On November 24, November 25, and December 4, 2013, the court listened to testimony, and received exhibits that addressed the origins and executions of subpoenas to the Suffolk and Bristol Couniy Sheriffs Departments for production to a Bristol County grand jury — "In re: Brandon Callender Witness Intimidation." The two grand jury subpoenas bore the signature of Special Assistant District Attorney Steven E. Gagne. Both subpoenas demanded production of “copies of any audio-recorded telephone calls ... as well as any documents or logs associated with said calls.” Each subpoena offered the record holder the option of avoiding an appearance before the grand jury by forwarding the information to the Assistant District Attorney.
Evidence presented at the hearing also examined policies, practices, and rationales endorsed by the Suffolk and Bristol County Sheriffs Departments for intercepting all inmate calls, except for those involving attorney-client communications.
My findings begin with a review of the proceedings in the murder case because defense counsel claims that the prosecutor’s use of the grand jury subpoenas had, as its purpose, mitigating the loss of evidence occasioned by this court’s allowance of a motion to suppress statements made by Callender on April 7, 2008.
i. Arrest and Interrogation
On April 7, 2008, Fairhaven and state police, including Massachusetts State Trooper Robert Lima, and Fairhaven Detective Jerald Bettencourt, arrested Callender for the murder of Joshua Fitzgerald. The arrest occurred at a New Bedford apartment where Callender had been sleeping. The police found a Gangster Disciples’ ‘code of conduct’ on Callender’s bed.
Callender was transported to the Fairhaven Police Department. At the station, Callender was advised of his Miranda rights, exercised his right to silence, followed by being re-advised of his Miranda rights, and then questioned. The questioning by Lima and Bettencourt elicited statements from Callender relevant to the murder of Joshua Fitzgerald, and in certain instances, incriminating Callender in the homicide. Callender admitted to being in a fight with Fitzgerald. He stated that Fitzgerald had struck him with a two-by-four which caused him to pick up a knife and stab Fitzgerald.
In May of2008, a Bristol Couniy grand jury indicted Callender for first degree murder. His arraignment occurred on September 5, 2008, with Attorney John Moses (“Moses”) appointed to represent him.
Attorney Moses moved to suppress Callender’s April 7, 2008 statements on the ground that the statements had been taken in violation of his Miranda rights. Over the course of four sittings, the court received exhibits, and heard testimony on that motion to suppress. On September 10, 2009, the court issued a decision allowing the motion to suppress. The Commonwealth timely appealed. From September 22, 2009 until February 21, 2012, the case was before the appellate courts. The Appeals Court eventually affirmed this court’s allowance of the motion to suppress.
ii. “MG” letter
Meanwhile, ADA Gagne, who had been involved in the Callender prosecution from its inception, received a letter sent by an inmate at the Bristol County House of Correction sometime after March 26, 2010. That letter’s envelope bore as the address “DA’s Office, 888 Purchase Street #5, New Bedford, MA02740.” By some quirk or logic, the letter ended up on Gagne’s desk.
The letter composed an erratic presentation. On one hand, the writer, given the pseudonym “MG,” professes to want “to make the communily safe for our kids.” On the other hand, MG asks the Commonwealth to give him the “opportunity to . . . continue [his] education.”
Generally, MG made vague promises. MG promised that, within a month, the Commonwealth would “have dozens of guns, bricks of work, mad drugs, over $100,000, and more than 20 luxury cars . . .” In one instance, MG became quite specific, mentioning that “a inmate keep telling me that he will make show his witness don’t show by any ineans before he do 15 years.”
MG’s mention of the inmate talking about “doing 15 years” caused Gagne to recall negotiations with Callender over a second degree murder plea. In Gagne’s mind, such a plea could carry fifteen years. This association caused Gagne to look into MG’s Bristol House of Correction records.
The records revealed that Callender and MG had been housed together for one day. According to the records, on April 8, 2010, MG had attempted to hang himself. In MG’s shirt pocket correctional staff found a one-page “inmate property inventoiy sheet” that contained handwritten notes in black and blue ink. The notes appeared in various places on the sheet’s front and back. According to the attending correctional officer, the notes contained information about a murder, harming a witness and a “G.D.” By the time Gagne retrieved the records, MG had been released.
Notice of Callender and MG rooming together caused Gagne, accompanied by Bettencourt, to travel *51 to State Street, New Bedford, to look for MG. Their search proved to be unsuccessful. Gagne enlisted Trooper Lima to attempt to find out about and locate MG.
Lima examined the inventory sheet, and observed that it was written in black and blue ink. Some of the notes referred to a stabbing, resulting in the victim dying at the hospital. Another note referred to the co-defendant (Thomas Opozda) last having the knife and that the person relating this information believed that his DNA would not be found on the knife as he had not been sweating. Another note, which would prove to be significant in the investigation, concerned what appeared to be two attempts to kill someone that had been called off because of a desire to see if the individual would “show.” Another entry noted “I’m a Gd ... I was #2 but now I am #1 ... I got. . . [people out there that] will lay anybody down.”
iii.MG Interview
In the fall of 2010, Lima learned that MG was in a Connecticut jail. Working with MG’s lawyer and Connecticut prison officials, arrangements were made to interview MG.
On February 24, 2011, at the Connecticut jail, with MG’s lawyer present, Lima and Gagne spoke with MG. Shown the inventory sheet, MG identified the blue handwriting as his handwriting. Asked about the name of the inmate who had provided the information noted on the inventory sheet, MG referred to him as “Brian.” Lima then showed him one picture of Callender, which MG immediately and confidently stated was the inmate. After identifying the picture, MG agreed with Lima that the person in the photograph was Brandon.
During the interview, MG stated that Callender had spoken about twice having solicited others to kill a witness, but had halted' the efforts in order to see whether the "witness came forward at the trial. MG said that Callender had never indicated when these efforts to get rid of the witness had occurred, or when they had been stopped. According to MG, Callender also had spoken about the co-defendant Thomas Opozda. He blamed Opozda for giving the police the knife used in the murder. According to Callender, he was in jail because of Opozda. He stated that if Opozda was “out on the street he would be dead by now. I’m a GD . . . I was #2 now I am #1 in my click, I got [people][1] that "will lay down for me.”
MG stated that after he had talked with Callender, he had taken his inventory sheet and jotted down notes on what Callender had said. He admitted that his mind sometimes plays tricks because he has smoked too much “weed.” The Commonwealth knew that MG had a criminal record and a psychiatric history.
iv.Gagne’s Special Assignment
By January of 2011, Gagne had become the first assistant district attorney of the northwest district. On April 11, 2011, he was appointed a special assistant district attorney responsible for prosecuting Karen Cordeiro and Brandon Callender. His appointment as a special Bristol County assistant district attorney was never amended to include an ancillary investigation into MG’s allegations.
v.Sheriffs’ Departments Telephone Policies and Practices
Both the Bristol County and Suffolk County Sheriffs’ Departments have used multiple methods for notifying inmates of the interception of outgoing phone calls. The Bristol County “Inmate Orientation, Handbook & Rules” notified inmates that “all outgoing calls are subject to recording and monitoring except attorney calls.” It advised the inmate that he can select up to 10 pre-approved calls. The inmate’s first ten calls represent the ten pre-approved calls. Every month the pre-approved calls are purged. The inmate may create a new list by keeping the old ones or by adding new numbers to replace prior numbers.
Both Suffolk and Bristol had telephone systems programmed to advise the inmate and the person being called that calls were being recorded and were subject to being monitored. The Bristol notification added the warning that “you have the right to remain silent. . . anything you say may be furnished to state and/or federal prosecutors and may be used against you in a court of law.”[2]
Both departments’ practices on allowing access by law enforcement to hear the calls, and retaining the calls need not be extensively described as such practices and policies generally, lack relevance to the pending claims. Here, the defendant focuses on two claims: first, that the recording and monitoring of his calls violated his privacy rights and failed to serve valid penological interests; and second, the Commonwealth’s access to intercepted conversations through issuance of a subpoena under G.L.c. 277, §68 violated the statute and usurped the Grand Jury’s investigatory authority.
The first claim urged by Callender concerns whether the recording and possible monitoring of all outgoing calls, other than attorney-client communications violated his rights under the United States and Massachusetts constitutions. As memorialized in its “inmate telephone system” the Suffolk County Sheriffs Department justifies the monitoring of calls on the basis of ‘maintaining the security, good order, or discipline of the facility and prevention of criminal activity "within or outside of the facility."
Bristol County Sheriffs Department policies have a similar scope. Besides preventing escapes or preventing drugs from coming into its facilities, Bristol’s policies on recording telephone calls, and monitoring *52 calls have as one of its purposes “to detect and deter criminal activity within or without the institution.”
vi.Callender’s Calls
Callender was held at the Bristol County Sheriffs Department facility from April 7, 2008 to February 23, 2009, and from Februaiy 2, 2010 through August 31, 2011, the date when the subpoenaed telephone records were ordered to be produced before the grand juiy. From Februaiy 23, 2009 to Februaiy 2, 2010, he was housed at the Suffolk County facility located on Nashua Street. During his time at the Suffolk and Bristol County facilities, Callender made over 500 phone calls. Many of these calls involved calls to his mother and concerned personal matters. Other calls included calls to a girlfriend. Gagne and Bettencourt each heard a call that each identified as an attorney-client call. Notice that it was an attorney-client conversation caused Bettencourt and Gagne to cease listening.[3]
As an inmate at the Bristol and Suffolk facilities, Callender had limited opportunities for contact and communication with people outside of the institutions. All of his incoming mail was opened for purposes of identifying contraband. Visits at the Bristol County jail occurred in a congested environment.
vii.The Investigation into Callender’s Calls
Callender’s second claim asserts the subpoena’s execution failed to comply with G.L.c. 277, §68 and overstepped the Grand Jury’s investigatoiy authority. In August of 2011, Gagne prepared grand juiy subpoenas directed to the Bristol County and Suffolk County Sheriffs Departments. The subpoenas had on the top left-hand side, “Grand Jury.” The subpoenas commanded the respective Sheriffs Department to bring to the Superior Court on August 31, 2011, “copies of any audio recorded telephone calls placed by Brandon Callender . . . and documents and logs associated with said calls [while in the custody of the particular sheriffs department].” The subpoenas presented the option to the Sheriffs’ Departments to avoid an in-court appearance by forwarding the information on or before August 31, 2011, to Special Assistant District Attorney Steven Gagne, c/o the Northwest District Attorney’s Office, Northampton, MA.
After personnel at the sheriffs’ departments had determined that the subpoenas complied as a matter of form, each sheriffs department elected to forward, by mail, the records to Special Assistant District Attorney Gagne. These records, which had been converted into five discs, covered over 500 phone calls.
The subpoenas’ return dates were August 31,2011. On that date, the Bristol County grand jury met. However, the grand jury that met that day never received either the discs or records and did not receive notice of any grand juiy investigation into Callender’s alleged witness intimidation.
Gagne received the five discs containing Callender’s phone calls. He distributed three discs to Bettencourt, and two discs to Lima.
Over the course of thirty hours, Bettencourt, aided by Detective Cudmore, listened to 100 calls. Over the course of August 31, 2011, to December 13, 2013, Lima listened for some 336 hours (“two weeks worth of listening”) to Callender’s calls.
Lima described the listening process as “slow.” At times, he listened to an entire call, then went backwards, followed by reviewing it again to comprehend Callender’s vernacular. Gagne has also listened to calls.
The investigation into the calls has been hobbled by the sheer number of calls, as well as the investigators’ other responsibilities. Lima listened when his other responsibilities as a homicide detective and trooper permitted. His three months of yearly active military duty, and his two deployments to Iraq lessened the time that he had available to complete the review of the assigned calls. Likewise, Bettencourt and Cudmore served as detectives in a small detective unit. Their normal job responsibilities restricted their ability to listen to the calls. As the new first assistant district attorney in the northwest district, Gagne’s responsibilities limited his capacity to both direct the investigation, and to listen to calls.[4]
viii.The Grand July’s Involvement
No grand jury has ever participated in this investigation. Gagne has never brought any witness, or any record, concerning the Callender witness intimidation investigation before the grand juiy. He never consulted the grand jury and has never sought guidance from the court. Nor does he have any specific time or span of time where he intends to present this matter before the Bristol County grand juiy.
ix.The Dissemination of Subpoenaed Information
On June 5, 2012, special assistant district attorney Gagne moved for an order to produce “recorded phone calls pursuant to Mass.R.Crim.P. 17(a)(2).” In the motion, Gagne asserted that the information amounted to “relevant and pertinent matter” in Callender’s murder trial. The affidavit quoted from material that Gagne had subpoenaed to the grand jury in the witness intimidation investigation. None of the affidavit’s material, though relevant to the involvement of Callender in Joshua Fitzgerald’s death, was submitted to the grand juiy.
RULINGS OF LAW
The grand juiy’s place “in Anglo-American histoiy ... is deeply rooted.” United States v. Calandra, 414 U.S. 338, 342 (1973). It serves as the institution charged with the weighty responsibilities “[of] discover[ing] and presenting] for trial persons suspected of criminal wrong-doing and [serving] as a protector of *53 citizens against arbitrary and oppressive government action.” Id. at 343.
“[A]s an investigatoiy party [the grand jury possesses] broad powers to ‘inquire into all information that might possibly bear on its investigation . . .’ ” Commonwealth v. Williams, 439 Mass. 678, 683 (2003), quoting Matter of a Grand Jury Investigation, 427 Mass. 221, 226 (1998), cert. den., A.R. v. Massachusetts, 525 U.S. 873 (1998). A “grand juiy [may] inquire into all information that might possibly bear on its investigation until it has identified an offense or has satisfied itself that none has occurred.” United States v. R. Enters., Inc., 498 U.S. 292, 297 (1991). In Branzenburg v. Hayes, the Supreme Court observed that a grand jury’s inquiry “is not to be limited narrowly by questions of propriety or forecasts of the probable result of the investigation or by doubts whether any particular individual will be found properly subject to an accusation of crime.”[5] Branzenburg v. Hayes, 408 U.S. 665, 688 (1972), and cases cited therein.
A grand juiy subpoena completely differs in its purpose and use from a subpoena issued in the context of a prospective criminal trial where a specific offense has been identified in a particular criminal charge. United States v. R. Enters., Inc., 498 U.S. at 297. The law prohibits conflation of grand juiy and trial subpoenas. Commonwealth v. Cote, 407 Mass. 827, 832 (1990) (noting “the need for the strict separation of the grand juiy’s investigatoiy function and the district attorney’s prosecutorial function”). “[I]t is improper to use [a] grand juiy [subpoena] for the purpose of preparing an already pending indictment for trial.” Commonwealth v. Liebman, 379 Mass. 671, 677 (1980). “[T]he grand jury is an investigatory and accusatory body only.” Commonwealth v. McLeod, 394 Mass. 727, 733 (1985) (internal quotations omitted). “[I]t may not engage in the prosecution of indictments which it has chosen to issue.” Commonwealth v. Cote, 407 Mass. at 832.
i. The Investigation of MG’s Intelligence
An investigation into MG’s reports of aborted and contingent conspiracies to kill a witness folded naturally into the grand jury’s investigative authority. Under G.L.c. 277, §68, the grand jury had authority, through its agents, the attorney general or district attorney, to issue subpoenas “under their hands for witnesses to appear and testify ...” Commonwealth v. Odgren, 455 Mass. 171, 175 n.8 (2009). “[H]owever, it would be unethical for the Commonwealth to use this statutoiy authority for any purpose other than to present a witness or evidence to a court or grand juiy.” Commonwealth v. Mitchell, 444 Mass. 786, 798 n.17 (2005).
Here, neither the record keepers nor the prosecutor ever presented the discs or records to a grand jury. Though the Bristol County Grand Juiy was sitting on the subpoenas’ return date, it never received the discs or records, nor held any proceeding in regards to the materials returned under the authority of the subpoenas issued pursuant to G.L.c. 277, §68. The failure to bring the records before a grand juiy presumptively contravened G.L.c. 277, §68, which authorized production of the defendant’s telephone records at an evidentiary hearing conducted before a grand juiy. Commonwealth v. Odgren 455 Mass at 184.
The Commonwealth justifies its exclusive possession of the telephone records under the claim that it had authority to screen the records. The prosecutorial practice of screening records for the purpose of filtering out irrelevant and privileged material has been followed in the federal courts. See United States v. Deffenbaugh Indus., Inc., 957 F.2d 749, 753 (10th Cir. 1992) (‘The alternative of allowing the response to be sent to the prosecutors directly is apparently a practice that has developed as an administrative convenience. It is not discouraged by the grand jury themselves nor condemned by courts because of the special role of the prosecutor to assist the grand juiy by organizing and evaluating evidence and giving it legal advice.”). In Odgren, the court observed that the authority of a prosecutor to screen subpoenaed witnesses or records was “beyond the scope of this case.” Commonwealth v. Odgren, 455 Mass. at 179 n.17.
Federal courts have required some participation by the grand juiy in relation to “screening” subpoenaed documents. See United States v. Smith, 687 F.2d 147, 149-50 (6th Cir. 1982); In re Melvin, 546 F.2d 1, 5 (1st Cir. 1976) (A prosecutor “may not use his subpoena powers . . . without the participation of the grand juiy”); United States v. Anglian, 784 F.2d 765, 769 (6th Cir. 1986) (“[W]e indicated in Smith, however, that some involvement of the grand juiy is necessaiy”). In Smith, the court, in upholding the government’s screening, observed that “[t]he authority and involvement of the grand jury was implicit in this transaction, even though peripherally, when [the witness’s] appearance was placed on the grand jury’s schedule, [and] a grand juiy file was opened for the investigation . . .” United States v. Smith 687 F.2d at 152.
In State v. Guido, 698 A.2d 729, 735-38 (R.I. 1997), the Rhode Island Supreme Court examined closely the implications of a prosecutor’s independence in issuing and executing grand jury subpoenas. Without a grand juiy’s involvement and supervision from a court, a grand jury’s broad investigatory powers could be usurped in favor of expanding the investigatoiy authority of the prosecution and police. Id. at 736.
Here, for a period in excess of two years, the special assistant district attorney has had the records without any nominal or substantive involvement by the grand jury. Despite the period of time that has elapsed, the records were never made known to the grand juiy, and the records were never marked before the grand juiy. The grand jury thus lacked any involvement or knowl *54 edge of the records. Nor has the special, assistant district attorney’s actions comported with handling the records as the grand juiy’s agent. The assistant district attorney, as the grand juiy’s agent, issued grand jury subpoenas for the production of discs and records. Such subpoenaed records and discs constituted material that ought to “remain secret.” WBZ-TV4 v. District Attorney for the Suffolk Dist., 408 Mass. 595, 599 (1990).
The assistant district attorney, without consulting or informing the grand jury, submitted the content of some of the subpoenaed telephone calls in a motion made under Mass.R.Crim.P. 17. The purpose of this disclosure had nothing to do with the grand juiy but rather had eveiything to do with acquiring evidence for use in the trial of this case. Commonwealth v. Cote, 407 Mass. at 832 (“[T]he district attorney, without any prompting from the grand juiy, used a grand juiy subpoena to acquire telephone records which were not presented to the grand juiy in any form but which were presented at the trial of the defendant”). See also People v. Corr, 683 P.2d 20, 30 (Colo. 1984) (suppressing evidence obtained through improper use of grand juiy subpoena). Even though the calls contained statements relevant to Callender’s involvement in a conspiracy to kill a witness the grand juiy never received these calls. Without evidence of Callender’s involvement in Fitzgerald’s death how could the grand juiy comprehend his involvement in a conspiracy to kill a witness?
Nor did the use of the subpoenaed materials in support of issuance of a subpoena pursuant to Mass.R.Crim.P. 17 have anything in common with the function of screening the records for the purpose of assisting the grand jury in focusing its time on materials relevant and appropriate to the intimidation investigation. The use of the subpoenaed materials solely concerned the Commonwealth’s prosecution of Callender for the murder of Joshua Fitzgerald. In using the subpoenaed records for the purpose of gathering evidence for the trial, the assistant district attorney failed to act as the grand juiy’s agent but rather acted solely as a prosecutor.
CONCLUSIONS
The evidence as a whole reveals that the assistant district attorney’s investigation of telephone conversations recorded at the Bristol and Suffolk County facilities lacked any involvement by the grand jury. Though the subpoena bore the words “grand juiy,” the grand juiy never learned of the subpoenas.
For over two years, the prosecutor and police conducted an independent investigation. Upon discovering relevant information, the assistant district attorney only used that information for the purpose of aiding the prosecution of Brandon Callender for the murder of Joshua Fitzgerald. Based on these actions and omissions, the court finds and rules that the Commonwealth’s custody and use of the telephone records did not comply with G.L.c. 277, §68.
A succeeding, material question asks whether the special, assistant district attorney’s failure to involve the grand juiy sprung from a bad faith desire to use the grand juiy’s subpoena powers primarily for the purpose of securing evidence and information useful in the prosecution of Callender for the murder of Joshua Fitzgerald. That possible inference rests on the lack of any grand jury involvement in this extensive investigative enterprise.
The telephone calls’ potential to aid both functions had to be evident. Callender’s calls would naturally be expected to contain reference to his defense and his willingness to accept a plea. A young man facing a murder indictment would naturally be expected to talk with his mother about his defense and any plea possibilities. Indeed, the prosecution team, in listening to the calls, knew that Callender often spoke with his mother over the jail’s phones and therefore could reasonably expect that he would confide in her.
Moreover, listening to Callender’s calls would allow the Commonwealth to develop an understanding of how he might testify and how his testimony could be attacked in cross examination. Learning about how he spoke, what words he favored, how he thought, and whom he associated with, would aid preparation for any cross examination of Callender’s testimony. Indeed, Gagne devoted many hours to listening to Callender’s calls. In that complicated context, the assistant district attorney should have notified the grand juiy of the investigation and the subpoenaed discs and records. But he failed to do anything but continue to examine independently the discs and records.
This problem of overlapping functions was aggravated by Gagne’s lack of explicit authority to conduct the investigation. See Commonwealth v. Angiulo, 415 Mass. 502, 511-13 (1993). His appointment as a special, assistant district attorney for Bristol County only authorized him to prosecute Karen Cordeiro and Brandon Callender. It failed to authorize him to perform any other functions. Nor can it be said what the District Attorney would have done if aware of the investigation. He may have prudently assigned another district attorney to handle it and thereby avoid any potential conflict.
Callender claims that Gagne used the grand jury investigation as a pretext to remedy the loss of evidence due to the motion to suppress. Though this inference possesses some support in the evidence, it fails to explain why Gagne failed to take the simple step of bringing MG’s credible report of a conspiracy to kill a witness to the grand juiy’s attention. The Commonwealth possessed an undeniable right to employ the grand juiy’s broad powers to investigate aborted and contingent plans to kill a witness. Nor was this investigation without merit.
*55 The Commonwealth had good cause to believe MG’s accusations. It had documentary proof of Callender sharing a cell with MG. It had handwritten notes on an inventory sheet written by MG about the death of Joshua Fitzgerald and Callender’s involvement in that killing. It had other credible evidence that significantly corroborated MG’s allegations.
MG’s accusations concerned a grave matter, the killing of a witness. While MG’s allegations overlapped Callender’s murder case, such a convergence fails to bar a grand jury’s investigation into the matter. United States v. Alred, 144 F.3d 1405, 1413 (9th Cir. 1998); United States v. Leung, 40 F.3d at 581.
Gagne, because of his pressing duties as the Northwest District’s new First Assistant and his personal responsibilities, neglected his duty to present the investigation to the Grand Jury’s attention. Over time, the neglect turned into indifference. An insidious indifference blurred the sharp edges of lines demarcating the grand jury’s investigative powers from powers possessed by police and prosecutors. The two different powers became one.[6]
While the special assistant district attorney’s negligence and indifference are not to be ignored, it rationally and persuasively explains the grand jury’s lack of involvement. I find and rule that the credible evidence fails to demonstrate bad faith.
REMEDY
On the basis of the violation of G.L.c. 277, §68, the question arises as to what is the appropriate remedy in these circumstances. In this case, the Commonwealth procured the incriminating conversations in violation of G.L.c. 277, §68. Without the information subpoenaed under G.L.c. 277, §68, the Commonwealth would not have satisfied Rule 17’s requirements. Nothing presented at the evidentiary hearings establishes that the Commonwealth had or has independent information that satisfies the requirements set forth in Commonwealth v. Lampron, 417 Mass. 265, 269-71 (2004).
While MG’s information possesses indicia of trustworthiness it fails to establish that Callender used either jail’s phones to solicit, cancel or talk about plans to harm a witness. Lampron requires “a factual showing that the documents sought are relevant and have evidentiary value and that [potential relevance and conclusoiy statements are insufficient.” Commonwealth v. Odgren, 455 Mass. at 183 n.22 (internal quotations and citations omitted). This showing cannot, therefore, be based on loose impressions that incriminating conversations occurred over the phone lines. Rather, there must be facts set forth in a trustworthy affidavit that demonstrates that relevant information having evidentiary value will be found in the records.
In Cote and Odgren, the Supreme Judicial Court did not impose a suppression remedy. In foregoing suppression, Odgren noted the absence of bad faith and observed that the acquisition of the records failed to violate a constitutional right “for which evidentiary exclusion of the recordings might be appropriate.” Commonwealth v. Odgren, 455 Mass. at 188.
Here, the court does not find bad faith or that the recording or monitoring of the telephone calls violated the defendant’s constitutional rights. If the special, assistant district attorney had properly presented the materials to the grand jury, the subpoenas would have conformed with G.L.c. 277, §68.[7]
Nor is the blunt force of the suppression remedy necessary. Supervisory powers can be employed to devise procedures that will maintain the grand jury’s institutional integriiy without prejudicing the grand jury’s historic reliance on prosecutors to provide convenient and necessary services.
In accordance with the decisions in Cote and Odgren, this court declines to suppress the telephone call recordings secured pursuant to G.L.c. 277, §68.
i. Search and Seizure Violation
Defendant argues that the subpoenas violated the reasonable expectation of privacy that he, a detainee, possessed in the telephone calls. But the Supreme Judicial Court has repeatedly held that the practice of notifying a detainee that his calls will be recorded and may be monitored precludes any expectation of privacy. Commonwealth v. Gomes, 459 Mass. 194, 206-07 (2011) (“We recently have said that a pretrial detainee does not have a reasonable expectation of privacy in his recorded telephone conversations at the house of correction where he is being held, where he is on notice that all telephone calls are subject to monitoring and recording, and where the monitoring and recording are justified by legitimate penological interests”); Matter of a Grand Jury Subpoena, 454 Mass. 685, 688-90 (2009).[8] But in both cases, the Court lacked a record containing a direct challenge to the practice of recording the calls as opposed to forwarding telephone recordings to law enforcement. Matter of a Grand Jury Subpoena, 454 Mass. at 690 n.8.
Here, Callender claims that he possessed significant privacy interests and that the Bristol County and Suffolk County Sheriffs’ Departments lacked evidence that the notification of recording and monitoring calls served penological interests.
ii. Privacy Interests
The subpoenas called for the production of Callender’s phone calls numbering over 500 that were made over a three-year period in both the Bristol County Jail and the Suffolk County Jail. Such a volume of information about what Callender communicated to others gives the government an understanding of Callender’s habits of speech, his thinking, his desires, his associations and his thoughts. Commonwealth v. Blood, 400 Mass. 61, 69 (1987) (intru *56 sions that “threaten the privacy of our most cherished possessions, our thoughts and emotions, [are] peculiarly intrusive upon that sense of personal security which art. 14 commands us to protect”).
Surveillance of Callender’s emotions, thoughts and social habits intruded upon his privacy regardless of whether such intrusions should have been expected. A detainee’s understanding that others may access his conversations with loved ones and friends may be reasonably expected to result in lessening or eliminating the detainee’s use of the telephone for the purpose of having social contact with friends and relatives who serve as sources of emotional comfort and guidance. Increases in social segregation and feelings of isolation may induce distress that weakens the detainee’s mind and spirit thereby enfeebling his ability to defend himself. He may be less able to consult effectively with his counsel and make a favorable impression before a judge or jury. Albert W. Alschuler, Preventative Pretrial Detention and the Failure of Interest-Balancing Approaches to Due Process, 85 Mich.L.Rev. 510, 517-18 (1987).
iii. Evaluation of Penological Interests
In Cacicio v. Secretary of Pub. Safety, 422 Mass. 764, 770-72 (1996), the Court outlined a four-part test for evaluating the validity of a correctional facilities regulation of inmate telephone calls. That test evaluates whether: (1) there exists a valid rational connection between the regulation and the underlying penological interest that is valid and neutral; (2) are there available alternative means for communications ■with others; (3) will accommodating the inmates interests in unregulated telephone calls produce a “ ‘ripple effect’ on other inmates, and guards and the allocation of prison resources”; and (4) is there any alternative that “would fully accommodate the inmate’s rights at de minimis cost to valid penological interests.” Id. at 770.
Except for the absence of any escapes from the Bristol County facilities, and the recent use of a recorded call to prevent a delivery of drugs, neither Sheriffs Department introduced evidence demonstrating reductions in escapes, drug deliveries or crimes.
Proving that deterrence has actually worked is difficult if not impossible. Individuals deterred from planning or carrying out crimes can hardly be expected to be sources of crime prevention statistics.
But a logical correlation can be made that an awareness that the calls will be recorded and may be monitored influences behaviors. Awareness of a Sheriffs surveillance of telephone calls logically chills criminal conversations. Knowledge that one’s words will be recorded and may be listened to by the Sheriff will make most people refrain from using outgoing phone calls to plan or carry out crimes.
Other means such as letters or visits pose self-evident risks. Letters create a record of the crime. The exchange of letters fails to equate with a free flowing telephonic conversations as a means for agreeing on the details necessary to carrying out a crime. A response to the inmate’s letter may be thwarted by the addressee’s belief that its letter may be opened by correctional officials. Though the policy only calls for opening the letter to discern contraband, the letter writer may imagine a more intrusive examination. Using a visit for the purpose of planning a crime would run the risk of the conversation being overheard by correctional staff or inmates who might peddle information for favors.
Inmates have other means for legitimate, confidential communications. They write letters and talk with visitors. In this case, Callender has friends and relatives who live in Bristol County.
Efiminating notice of calls being recorded and subject to monitoring would increase the need to post scarce security personnel near phones or rely on inmates for information. Such increased reliance on inmates could make inmate relationships vulnerable to suspicion, intimidation, and retaliation. The “ripple effect” could well be more violence and tension within the facilities.
Finally, no persuasive arguments have been presented that allowing inmates to make calls without concern for what they talk about will fail to produce material prejudice to valid penological interests. On this issue, the court defers to the judgment of Sheriffs responsible for managing their facilities. Cacicio, 422 Mass. at 771-72.
In making this ruling that penological interests justify the recording and monitoring of telephone calls, the court rejects the claim that a Sheriffs interest in generally curtailing crimes by detainees fails to serve a valid, penological interest. Promoting orderly and law abiding behaviors constitutes a core penological concern. Measures aimed at diminishing criminal conversations and criminal activities help to diminish the formation of attitudes and beliefs that underline undisciplined and subversive conduct. Conversely, being less vigilant about preventing criminal thoughts and actions supports the creation of a criminal culture.
iv. Common-Law Rights Governing Grand Jury Subpoenas
The Supreme Judicial Court in Matter of a Grand Jury Subpoena stated that under the common law, a grand jury “may not issue unreasonable orders to produce documents.” 454 Mass. at 692. The court cited Commonwealth v. Doe, 408 Mass. 764, 768 (1990), and Hale v. Henkel, 201 U.S. 43, 76 (1906). In Hale v. Henkel, the United States Supreme Court declared that a subpoena duces tecum, to constitute a lawful order, must be reasonable in its scope. 201 U.S. at 76.
*57 In determining whether the subpoenas measure up to a reasonable discovery device the court must examine not only whether the subpoena seeks relevant information but also the subpoena’s effect on privacy interests. Matter of a Grand Jury Subpoena, 454 Mass. at 692-93. In Doe the court relied on the common law and the court’s supervisory authority for regulating the subpoena power. 408 Mass. at 770.
v. Reasonableness Standards
In determining whether a subpoena constituted an unreasonable request for information, courts have examined the following criteria: (1) that the subpoena command only the production of materials relevant to the investigation;[9] (2) the subpoena specify the materials to be produced with reasonable particularity; and (3) the subpoena command production of materials covering only a reasonable time. See In re Corrado Bros., 367 F.Sup. 1126, 1129 (D.Del. 1973); In re Grand Jury Subpoena Duces Tecum, 203 F.Sup. 575, 577-78 (S.D.N.Y. 1961).
Here, the breadth of the subpoenas has to be reviewed with regard to what the Commonwealth knew. It had good cause to believe that at some undetermined times Callender initiated two directives to kill a witness and later suspended his plans. The temporal uncertainty prevented the Commonwealth from narrowing the calls. Further, the Commonwealth lacked information on whom Callender solicited to kill the witness and who Callender spoke with about his plans to kill the witness. These gaps in the Commonwealth’s knowledge justified the subpoenas’ breadth. As to specificity, the subpoenas described with particularity the items to be produced, namely audio tape recordings and documents and logs associated with the calls. As previously discussed given the gaps in knowledge the subpoenas’ time frame was reasonable.
vi. Less Intrusive Means
Through the use of initial subpoenas the Commonwealth could have produced the pre-approved phone call lists which could have been used to identify who Callender was speaking with. Where the Commonwealth determined that calls were being made by Callender to his mother then what basis would exist for the government to discern a possibility that Callender and his mother were plotting to kill a witness or discussing a possible plan to do so? Additionally, if the pre-approved calls revealed individuals readily identifiable as parties whose professional conversations constitute privileged matters, what interest would justify listening to those calls? In the above situations the Commonwealth ought to be required to demonstrate to a court that reasonable suspicion exists that the calls to a mother or professional will contain evidence of a crime.
In sum, the court determines that the subpoenas satisfied the reasonableness standard set forth in Matter of a Grand Jury Subpoena with the exceptions of calls to Callender’s mother and any professional whose conversations with the defendant would be legally privileged. See Matter of a Grand Jury Subpoena, 454 Mass. at 692.
ORDER

The court purged a racial slur from the quote.

These practices parallel generally but not entirely practices delineated in Matter of a Grand Jury Subpoena 454 Mass. 685, 686-87 (2009).

Apparently, Attorney Moses’s number had not been identified as the number of a lawyer.

The Commonwealth’s brief mentions that during this period, the special assistant district attorney had to undergo surgery and enjoy the arrival of a new child.

Grand jury proceedings enjoy “a presumption of regularity.” National Commodity & Barter Ass’n v. United States, 951 F.2d 1172, 1174-75 (10th Cir. 1991); United States v. Leung, 40 F. 3d 577, 581 (2nd Cir. 1994).

The court’s consideration includes the assistant attorney’s November 1, 2012 statement where he referred to the grand jury acquiring the phone calls.

No discovery violation applies as the Commonwealth, in 2012, provided the discs to the defense. (See Exhibit 13.)

A violation of a reasonable expectation of privacy has been defined as occurring “when the government violates a subjective expectation of privacy that society recognizes as reasonable.” Kyllo v. United States, 533 U.S. 27, 33 (2001), quoting United States v. Katz, 389 U.S. 347, 361 (1967) (Harlan, J., concurring). This oft quoted formulation of a reasonable expectation of privacy derives not from the majority opinion in Katz but rather from Justice Harlan’s concurring opinion. It has been criticized as giving the government the means to eviscerate a subjective expectation of privacy. Anthony G. Amsterdam, Perspectives on the Fourth. Amendment, 58 Minn.L.Rev. 349, 384 (1974). Nonetheless, Judge Harlan’s formulation of what constitutes a reasonable expectation of privacy has been followed by the United States Supreme Court. See California v. Cirialo, 476 U.S. 207, 211 (1986).

Justice O’Connor defined a lack of relevancy as when “there exists no reasonable possibility that the category of materials that the Government seeks will produce information relevant to the general subject of the grand juiy’s investigation." United States v. R. Enters., Inc., 498 U.S. at 301.